WARNER, J.
Both the father and mother appeal the termination of their parental rights to their child. The trial court terminated their rights based upon its findings that they failed to substantially comply with their case plans; that their conduct demonstrates that their continuing involvement in their child’s life threatens her life and safety, regardless of the provision of services; and that they materially breached their case plans by failing to substantially complete them prior to their expiration. Primarily, the court found that over the three years that the child has been in foster care the parents have failed to provide support to the child, have made no meaningful effort do so, have continued to test positive for drugs contrary to their case plans, and, in the case of the mother, materially breached the plan by continuing to have contact with the man who abused her other child and committed acts of domestic violence against her. Although these parents have made some attempt to comply with their case plans and engage with their child, we cannot say that the trial court abused its discretion in terminating their rights.
D.O. was born in October 2005 to S.M. In July 2006, S.M. married J.P., who was not the father of D.O., and they had a son in 2006, J.A.P. The family lived with S.M.’s mother in her small three bedroom home. Neither S.M. nor J.P. worked, and S.M.’s mother was their main source of support. In October 6, 2006, D.O., and her seven-week-old brother, J.A.P., were removed from the mother, S.M. and father, J.P. The seven-week-old son had suffered egregious abuse, and his injuries indicated the child had shaken baby syndrome, including bilateral subdural hematomas, retinal hemorrhages and possible blindness, old bone fractures, bilateral breaks of the wrist bones, bilateral breaks of the pelvic bones and other injuries. Both children were sheltered, and D.O. was placed with her alleged paternal grandparents, the parents of the man whom S.M. believed was the father.
The Department of Children and Families commenced an expedited termination of parental rights, proceeding as to both children based upon the abuse to J.A.P. DCF did not offer services to either parent because of its determination that termination for both children was the appropriate remedy. With respect to D.O., the department alleged in its petition not only the egregious abuse of her sibling but also the mother’s substance abuse, excessive smoking around the child, failure to take the child to necessary medical appointments, and leaving her with inappropriate caregivers.
Neither S.M. nor J.P. admitted causing the injuries to J.A.P. During the termination trial, J.P. voluntarily gave up his rights to J.A.P. The evidence at trial showed that S.M. was the victim of domestic violence from J.P. The court terminated S.M.’s rights to J.A.P. because she failed to protect J.A.P. from abuse. However, as to D.O., the court found that the child had not been abused and that the grounds for termination as to D.O. had not been proved. The court adjudicated D.O. *203 dependent and ordered that DCF develop a case plan for reunification or adoption for S.M. Both S.M. and her mother were allowed visitation with D.O., which they both exercised regularly. S.M. was also ordered to have no further contact with J.P. or his family.
S.M. appealed the order terminating her rights to J.A.P., and DCF appealed the order denying the termination of her parental rights to D.O. See D.O. v. S.M., 981 So.2d 11 (Fla. 4th DCA 2007). This court’s opinion contains a lengthy description of the facts of the proceeding. We affirmed the denial of termination of S.M.’s parental rights as to D.O. Our decision was final in December 2007.
In the order of dependency, the trial court required that a case plan address the following issues: the mother’s lack of parenting skills; the mother’s lack of education; the mother’s lack of employment; the mother’s lack of housing; the mother’s continued acceptance of domestic violence; and the mother’s drug and alcohol use. It ordered domestic violence counseling, drug and alcohol evaluations, psychiatric evaluation, parenting classes, and anger management classes. It also required her to follow all recommendations as well as any other recommendations by the department. The court warned the mother in the order that if she violated the terms of the case plan, the Department “will file an additional Termination of Parental Rights Petition based on the mother’s non-compliance.”
The court ordered a psychological evaluation of the mother, and it was performed by Dr. Francis Crosby in May 2007, just after the termination proceedings but before the issuance of the final judgment. He interviewed the mother for about an hour and a half. Based upon that interview, he concluded that regardless of services she could not be rehabilitated, and D.O. would be in danger if she were returned to her mother at that time. He based this conclusion on the near-fatal abuse of J.A.P.; his diagnosis that the mother suffered from a mood disorder; the mother’s substance abuse; and her non-compliance with treatment. Nevertheless, he also provided a list of areas where the mother should be offered services through a case plan, and it appears that his list was incorporated in the final judgment of the trial court.
After a case plan was prepared for S.M., she immediately began working on the tasks assigned. She completed the recommended courses in parenting, anger management, domestic violence, and substance abuse in the summer of 2007. Although one of the providers recommended additional therapy to her, she declined the additional treatment. She had not improved in her education, but she did obtain a job working at Pizza Hut, and she paid child support to the family having custody of D.O.
S.M. had been charged in connection with the abuse to J.A.P. As a condition of pretrial release, she was ordered to have no contact with J.P. In violation of this condition and even after her training in domestic violence, she contacted him several times while he was in jail and after-wards. In January of 2008 she was re-incarcerated because she had been seen with J.P. She remained incarcerated until October 2008, when she entered a plea and was convicted of culpable negligence in connection with the injuries to J.A.P. She was sentenced to time served.
While she was incarcerated, she was seen by another psychologist, Dr. Sheehan. Dr. Sheehan found that the mother was at high risk for continuing the behaviors because of her continued contact with J.P., who abused both her and J.A.P. Although she had completed all of the required *204 courses on her case plan, her inability to comply with the court order by seeing J.P. showed that she had very poor judgment and insight. The mother had not benefit-ted from the services provided to her. As to substance abuse, S.M. described herself as a functional addict but contended that she did not use drugs around her children. She had, however, tested positive for drugs while under supervision, which was of concern to Dr. Sheehan that she would be using drugs even where there was external supervision.
S.M. told Dr. Sheehan that she intended to divorce J.P. and eventually did so in February 2009. She has not seen J.P. since January of 2008. In addition, she received her G.E.D. sometime after her incarceration.
We now digress from the mother’s story to weave in the evidence regarding the father, D.G. The father was born in Germany to an American father and a German mother and moved to the United States when he was young. During his teenage years, he began a relationship with S.M. which she terminated when she met J.P. The father did not know that the mother was pregnant with his child at the time. The mother reported to DCF that another man was the father of D.O. When that man questioned his paternity, DNA tests proved that he was not the father. D.G. was then identified as the child’s father, and DNA tests proved his paternity. D.G. did not learn that D.O. was his child until August 2007.
A petition for dependency was filed against the father, and an order adjudicating D.O. dependent as to him was entered. The father was given a case plan in October 2007 with a goal of reunification or adoption.
D.G. was seen by Dr. Rojas, a psychologist, soon after D.G.’s fatherhood of D.O. was established. Dr. Rojas found D.G. to be of average intelligence with no history of abuse and from a stable family. His opinion was that “overall findings are consistent with mild risk for future maltreatment. ...” While he recommended reunification between father and daughter, his recommendation required D.G. to complete certain tasks. “[I]t is suggested that reunification take place between six to twelve months of appropriate social behavior, absent from any substance use ... [and he should] be considered for full reunification ... only after completing all core requirements for reunification. He should obtain stable housing, employment, and meet with his daughter in a consistent manner.”
D.G. proceeded to enroll and complete all classes required in his ease plan. This included a substance abuse referral, but no treatment or other counseling was recommended for him, as he was considered not to be an abuser of drugs. He began visiting with D.O. For the most part, these visits were very positive.
One of the goals included child support which was due when D.G. became employable. Although he was a United States citizen, he did not have the proper paperwork to become employed due to his German birth, and his only previous employment had been with his father in construction. He did not resolve the citizenship issues until the beginning of 2010. The record does not explain the reason for the delay in receiving the “paperwork” for him to obtain employment.
Dr. Michaelanne Marie, a court psychologist, evaluated the father in August of 2008, after he had completed many of his case plan tasks. She interviewed him, administered various tests, and observed him with D.O. She found him to have a borderline IQ and low parenting skills, posing challenges to his ability to carry out daily tasks. He was still being taken care of by *205 his own parents. Although he admitted to smoking marijuana, she did not find that he was at risk of substance abuse. She was of the opinion, however, that he seemed to “lack the resources necessary to parent,” suggesting that he had limited capacity to take care of himself, let alone a child. She thought that he presented as a person who would have a hard time holding down a job or performing the daily tasks of living, such as paying bills. She did not recommend reunification.
In the fall of 2008, D.G. and S.M. resumed their relationship and began seeing D.O. together for visitation, which they did twice a week. Both the case manager and the guardian who observed many of the visits stated that the visits went very well with the child obviously enjoying the time she spent with her parents, and the parents acting appropriately with the child. The father did not interact with the child as much as the mother, mainly coloring with D.O. during each visit.
In June 2009, the family with whom D.O. had been residing for nearly three and a half years informed DCF that it could no longer take care of the little girl, and D.O. was removed from the home and placed with a licensed foster care custodian who had already adopted two children and was taking care of two others. At first, D.O. was quite reserved in the placement but subsequently warmed up to it. DCF did not consider the parents as suitable for custody of D.O.
The parents moved for reunification with their daughter several times without success. They had completed most of their tasks, but because neither of them were employed and they lived in a townhouse owned by S.M.’s mother, the court refused to reunite them. The court found that they did not demonstrate an ability to care for the child as all support came from the grandmother.
DCF finally filed its petition to terminate the rights of both parents in October 2009. It alleged that both parents had failed to substantially complete their case plans.
After the petition for termination was filed, D.G. and S.M. married in March 2010, and D.G. continued to live with S.M. in the townhouse. During the period from her release from incarceration in 2008 and the final hearing, S.M. completed her G.E.D. and started taking vocational photography courses online. She did not obtain a job. D.G. also completed the requirements for his G.E.D. but did not have his certificate of completion, which cost $200. It was pointed out at the termination hearing that D.G. could not muster the money to obtain his G.E.D. certificate even though the he and the mother spent about $70 per week on cigarettes.
At the hearing in August 2010 on the petition to terminate rights, Dr. Crosby, Dr. Sheehan, and Dr. Marie all testified, although none had performed follow-up examinations or investigations to determine the current situation of either parent. When asked in hypothetical questions about their opinions given the present circumstances of the parents, none of the experts changed their opinion about the very poor prognosis these parents faced. In particular as to the mother, even though the mother had left the abusive husband, married the father of the child, and completed most of her case plan requirements, these positive changes did not overcome the mother’s failure to have steady employment and her lack of judgment. Similarly, Dr. Marie stood by her opinion that the father lacked the skills and ability to parent.
The case manager testified that she had tried to assist the parties in obtaining employment by doing an internet search for *206 them and printing out applications. They told her that they had applied to those jobs, and they did not have the proper qualifications. While they had completed many of the tasks, they did not have stable housing and employment. Both she and the guardian ad litem recommended termination of the parents’ rights.
Both parents testified at the final hearing, and both claimed that their relationship was a good one. The mother did not explain her lack of employment. The father said he had applied to several employers within walking distance of his residence. He couldn’t remember exactly where they were, nor could he name but a few, and the addresses he gave were questionable. He said he had more documentation of his job search on his computer but did not know that he should have brought it to the final hearing.
Several drug test results were admitted which showed positive results for each parent within the year prior to the termination. In addition, the case manager had instructed both parents to report for random drug screening twice in the three months prior to the termination hearing, and they did not show up for either testing. At trial they claimed that they had not received the case manager’s message on their cell phone.
The trial court ordered termination of the parental rights of both parents. As to the mother, the court relied on the mother’s contact with J.P. after she was declared dependent and ordered not to contact J.P. Consistent with the opinions of the psychologists, the court determined that this demonstrated a severe lack of judgment. It noted that Dr. Sheehan had testified that her continued involvement with J.P. after having secured the counseling under her case plan indicated that she would continue to be a danger to her child regardless of the provision of services. The mother also tested positive for drugs two times in 2010 and failed to appear for drug tests on two occasions just prior to the final hearing, not only violating the terms of the case plan but again showing very poor judgment. The court found that the father’s inability to secure employment and provide for even himself showed that his continuing involvement in the child’s life threatened her health and well-being. “The parents do not have the ability nor disposition to provide the child with food, clothing, medical care or other remedial care recognized and permitted under state law ..., and other material needs of the child; neither parent is employed, and neither appear motivated to seek employment, despite the Department’s efforts to assist both parents in this regard.” The court also found that the manifest best interests of the child required termination because the likelihood was great that she would remain in long term care if parental rights were not terminated, yet she had the capacity to form a significant relationship with a parental substitute. The court also relied on the fact that both the guardian and the case manager recommended termination of parental rights. From this order both parents appeal.
The adjudication of a case involving termination of parental rights involves a two-step process. First, the court must find by clear and convincing evidence that one of the grounds set forth in section 39.806, Florida Statutes, has been proven. Second, the court must determine what outcome is in the manifest best interest of the children. C.M. v. Dep’t of Children & Family Servs., 854 So.2d 777, 779-80 (Fla. 4th DCA 2003). Furthermore, the petitioning party must establish that termination of parental rights is the least restrictive means of protecting the child from harm. In re D.A., 846 So.2d 1250, *207 1251-52 (Fla. 2d DCA 2003). On appeal, the appellate court’s task:
is not to conduct a de novo proceeding, reweigh the testimony and evidence given at the trial court, or substitute [its] judgment for that of the trier of fact. Instead, [it] will uphold the trial court’s finding “[i]f, upon the pleadings and evidence before the trial court, there is any theory or principle of law which would support the trial court’s judgment in favor of terminating ... parental rights.”
In re Baby E.A.W., 658 So.2d 961, 967 (Fla.1995) (quoting Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993)). Where the trial court’s finding that there is clear and convincing evidence to terminate parental rights is supported by competent, substantial evidence, the appellate court has no choice but to affirm. Id. This standard of review dictates the result in this case.
The trial court terminated both parents’ rights for failure to substantially comply with their case plans and material breaches of the plan. Section 39.806(1), Florida Statutes (2010), provides:
Grounds for termination of parental rights may be established under any of the following circumstances:
(e) When a child has been adjudicated dependent, a case plan has been filed with the court, and:
1. The child continues to be abused, neglected or abandoned by the parent or parents. The failure of the parent or parents to substantially comply with the case plan for a period of 9 months after an adjudication constitutes evidence of continuing abuse, neglect or abandonment unless the failure to substantially comply with the case plan was due to the parent’s lack of financial resources
2. The parent or parents have materially breached the case plan. Time is of the essence for permanency of children in the dependency system. In order to prove the parent or parents have materially breached the case plan, the court must find by clear and convincing evidence that the parent or parents are unlikely or unable to substantially comply with the case plan before time to comply with the case plan expires.
The mother contends that she offered clear and convincing evidence that she substantially complied with the case plan. Of course, as noted above, our standard of review dictates that we look at the evidence presented, not in the light most favorable to the parents, but in a neutral manner in which we must assess whether competent substantial evidence supports the trial court’s conclusion that the parents failed to substantially comply with their respective plans.
We start with the trial court’s conclusions regarding the mother. When the trial court declared the child dependent, it ordered a case plan for the mother to address the issues of lack of parenting skills, employment, housing, drug abuse, and mental health issues. The trial court found that the mother had not substantially completed her tasks. Although she had attended the necessary programs, including those on domestic violence, she continued her relationship with J.P. Dr. Sheehan found that this demonstrated very poor judgment and showed that she did not benefit from the services offered. Her opinion on the mother’s poor judgment was reinforced by the mother’s positive drug tests.
The mother asserts that her drug tests should be ignored, because “substantial compliance” is defined in section 39.01(73) *208 to mean that the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the child will not be endangered if she remains with the parent. As she maintains her drug use was not the cause of the removal of the child in the first place, the positive drug tests should not be a reason to terminate her parental rights. The original petition for termination filed in 2006, however, did allege as a ground for termination the mother’s drug history and drug use. The order of adjudication of dependency also established this as an issue to be addressed through the case plan. Therefore, we disagree that the tests should be ignored.
The trial court gave credence to the psychologist’s opinion that the mother would not benefit from additional services and still remained at high risk for abuse and neglect of her child. In addition, the trial court found that neither parent had obtained employment in the multiple years since their case plans were executed. The evidence indicated that both the mother and father appeared to have little incentive to find employment.
Although the immediate cause of removal of D.O. from the home was the egregious abuse of little J.A.P., both the original petition for removal and the order adjudicating her dependent were based not only on the physical abuse of J.A.P., but also on the mother’s drug use and lack of resources to care for the child. Thus, while a significant circumstance which caused the adjudication of dependency and case plan has been resolved by the divorce from J.P., this was not the only issue which caused the dependency. The mother still has issues with drugs, lack of employment, and overriding all of these is a lack of judgment which has not been resolved by the provision of services.
The mother entered into the case plan in May 2007. By the time of the final hearing more than three years had passed, and the mother had still not complied with its terms. She had violated its terms on several occasions. For nearly six months she continued to contact her abusive husband, causing her incarceration; she continued to use drugs; and except for a few months in 2007, she has failed to support her child at all. The court’s conclusions that she continued to neglect her child by failing to complete her case plan and that she materially breached her case plan were supported by competent substantial evidence.
As to the father, Dr. Marie testified that even after receiving services the father lacked parenting skills and could not take care of himself, let alone his child. The court concluded:
The father has not benefited from the services offered in his case plan. He has been unable to provide a home for himself during this case plan or at any time in his life. He resides in a home provided by the maternal grandmother and prior to that resided in his parent’s home. He was previously scheduled to be evicted from the current home by the maternal grandmother if he did not obtain a job. He has not obtained employment or provided any means of support for the child. The psychologist’s opinion is supported by the father’s history. He has not demonstrated an ability to provide for or care for his child which is the reason this child has never been returned to him. He has not remedied the reasons for the child’s removal and has failed to substantially comply with his case plan. On this record it is impossible to find otherwise.
While the father finished his G.E.D., he did not obtain the certificate of completion because he did not have the money to obtain it, even though he and the mother *209 were spending $70 a week on cigarettes, money which he did not earn himself. This alone shows a lack of judgment or settled purpose to substantially comply with the case plan, knowing of the importance of a G.E.D. in obtaining gainful employment.
The father argues that the court cannot terminate his rights where his inability to complete his case plan is due to his lack of financial resources or matters over which he has no control. He points to his inability to obtain legal employment until his visa issues were resolved and the fact that he has looked but has not found employment. The court, however, was not impressed with his efforts. Even if the delay in securing employment status was out of his control, since he secured the proper papers and received his G.E.D. he did not engage in a substantial job search. The trial court found that his efforts were less than sincere. Instead, both he and S.M. chose to sit at home, where they would play on the computer and occasionally smoke marijuana.
We do not agree with the trial court that, in and of itself, the fact that the grandmother allowed the parents to reside in her townhome shows that they lack stable housing. Indeed, particularly in these very difficult economic times, adult children are frequently living with their parents. But the trial court could appropriately consider the stability of that arrangement, because earlier the grandmother expected them to pay rent or to move at some point. While the grandmother testified at the hearing that the parents could stay as long as they wanted with her grandchild, the court could conclude that the arrangement was not entirely stable and that they were not taking any steps to show that they could be financially responsible for their child.
Contrary to D.G.’s assertions, it is not his lack of financial resources that caused the trial court to find abandonment by failing to complete his case plan, it was his own casual approach to his obligations. As the Third District noted in M.M. v. Department of Children and Family Services, 867 So.2d 573, 575 n. 1 (Fla. 3d DCA 2004):
In this case, the issue really is not the failure to have adequate employment or housing, for neither are legally required, per se, to be an adequate parent. In the Interest of J.R.C., 480 So.2d 198 (Fla. 5th DCA 1985). The Depression Era alone proves that families can successfully weather the storms of unemployment and poverty. Rather, the issue in this case is whether M.M’s lackadaisical approach to completing her case reunification plan evidences an unwillingness on her part to organize her life in such a fashion as to care for her children.
Just as in M.M., the issue in this case is whether D.G.’s approach to completing his case plan evidences an unwillingness on his part to organize his life in such a fashion as to care for his child. D.G. did complete parts of his case plan. He attended parenting courses. He completed his G.E.D. But, he did not fulfill even the requirements set down by Dr. Rojas for reunification, namely six to twelve months of appropriate social behavior and absence of substance abuse, and finding stable housing and employment. He did faithfully visit with his child, although frequently both he and the mother would be late, to the consternation of their child. But coloring pictures with a child does not show that the parent has developed the capability to care for that child. What it takes is a desire to take on that responsibility, knowing that the nurturing of a child is one of the most important endeavors of humanity.
*210 The trial court found that D.G. had not substantially completed his case plan within the time for its completion. Nearly three years had elapsed since its creation, more than enough time to complete its tasks and show an ability to take on the responsibilities of parenthood. The time for compliance has passed. We cannot find that the trial court abused its discretion in terminating their rights to the child.[1] While the parents have a right to raise their child, it is a right they may forfeit by their conduct. The child, too, has a right to achieve stability in her life with parents who will properly care for her. We must affirm.
POLEN and CONNER, JJ., concur.

. The trial court’s findings that termination was in the manifest best interest of the child and the least restrictive means have not been challenged by the parties. We therefore do not address them other than to note that these findings were supported by competent substantial evidence.