DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**D.S.,** the Father,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES,**
Appellee.

No. 4D14-3144

[April 22, 2015]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Hope Bristol, Judge; L.T. Case No. 2012-3813 CJDP.

Antony P. Ryan, Regional Counsel, and Paulina Forrest, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Carolyn Schwarz, Assistant Attorney General, Fort Lauderdale, for appellee Department of Children and Families.

Patricia Murphy Propheter, Sanford, for appellee Guardian ad Litem Program.

WARNER, J.

D.S., an incarcerated parent, appeals the termination of his parental rights as to his three children. The trial court terminated his rights based upon his incarceration. Because we conclude that competent substantial evidence does not support the termination as to two of the children, nor is termination in the children's manifest best interest nor the least restrictive means to prevent harm to the children, we reverse. We affirm the termination as to one of the children, who does not reside with the other two and who has not maintained a continuing relationship with D.S.

D.S., the father, has three children: D.S., Jr. (born 2006), P.S. (born 2008), and K.S. (born 2011). The children were sheltered on May 30, 2012, due to the mother's substance abuse and medical neglect. The mother

was found with drugs, and K.S., the youngest child, was found to be medically neglected, requiring hospitalization.

A month before the children were removed from the mother, D.S. was arrested and jailed on charges of robbery, aggravated assault, and other related charges. Despite this arrest, both parents were offered a reunification plan which went into effect on October 4, 2012. The plan required D.S. to comply with the conditions of his incarceration. D.S. was sentenced to six years of incarceration in January 2013, with an anticipated maximum release date of February 2018.

After their removal from the mother, two of the children, D.S., Jr. and K.S., the oldest and youngest child, were taken in by D.S.'s sister, the paternal aunt. The third child, P.S., was put in the custody of the Department and placed in non-relative foster care. At a judicial review in February 2013, the court adopted the goal of reunification. However, when the mother failed several drug tests, the Department filed a petition to terminate both parents' rights in July 2013, alleging D.S.'s incarceration for "a significant portion of the child[ren]'s minority," as the sole ground for termination of D.S.'s rights. In that petition, the Department noted that the paternal aunt had custody of D.S., Jr. and K.S. and provided a suitable permanent custody arrangement. P.S. was in foster care with another family. At the time of the filing of the petition for termination, D.S., Jr., was seven, P.S. was four, and K.S. was two.

At the hearing on termination, D.S. testified that he did not know that the mother was using illegal drugs at the time the children were placed in a shelter. Although he was incarcerated, his early release date is May 2017, with a maximum date of February 2018, with probation to follow.

D.S. has maintained consistent contact with his two children who reside with his sister. He writes them letters almost every week and visits with them by phone two to three times a week. They have good conversations, and the boys tell him they love him. Although K.S. was only a year old when D.S. was incarcerated, K.S. has warmed up to D.S. through visits to prison (which are contact visits) and the telephone calls. The aunt has brought the children four or five times to visit D.S. in prison. He has only been able to speak with the third child, P.S., twice due to his foster-care placement, but he still attempts to call every time he has telephone visitation with the other siblings.

He was glad that his sister was taking care of D.S. and K.S. He testified that "she has no problem taking care of them until I'm released." The aunt was doing it for his children, not him, because their parents had left them

2

when they were children. D.S. also noted that his father later came back and took him, for which D.S. was glad, comparing this to his own children's situation.

Before he was incarcerated D.S. was employed laying tile, and his brother has offered him a job when he gets out doing the same work. When he goes on work release eighteen months prior to his release from prison, he will be able to provide support for his children and accumulate money for housing.

The Guardian ad Litem assigned to the children visits them at least once a month. She has never observed the children interacting with the father on the phone or in person. When she has visited with the children, they do not ask her for either their mother or their father, nor do they tell her that they want to go home to their parents. P.S. looks to his caretakers as his parents, calling them "mommy" and "daddy" generally. D.S., Jr. and K.S. are also happy with their aunt and her family. They have bonded with them. She felt it important to continue their current placement. When asked if the case "should remain open" until the father was released from incarceration and could be reunified with the children, the guardian simply said "that would not enable any kind of permanency for the kids, and they're young and they need permanency now, not in four years from now." The guardian also testified that both the foster parents of P.S. and the aunt wish to adopt the children.

Both D.S., Jr. and P.S. are in therapy. Interestingly, the guardian testified that the reason D.S., Jr. continued in therapy was for the therapist to work with D.S., Jr. "so that [he] can place himself in that family and feel comfortable and good about it and continue on with it." This appears inconsistent with the guardian's testimony that D.S., Jr. was bonded with his aunt and uncle. Moreover, D.S., Jr. talked about his father with the guardian and even showed her a picture that he had taken when he visited his father in prison, also contradicting her earlier testimony that the children never talked about their father.

P.S. has difficulty in sharing and is in therapy for that issue as well as aggressiveness. This is one reason why his foster home is good for him, the guardian opined, because he is the only child in the home, and the caregivers can address these issues continually. P.S. has stated that he does not want to visit D.S. in prison.

The Department's termination of parental rights specialist testified that all three children know that D.S. is their father, even though they also look to their caretakers as parental figures. When asked what risk the children

3

would face if the father's rights were not terminated and he was given a chance to get housing and income once he was released from prison, the specialist simply said "these children will be at a standstill," and, they need permanency. Despite this, she admitted that when he would be released from prison, all the children would have "a good way before they turn eighteen . . . [a] good amount of time."

Last, the paternal aunt who has custody of D.S., Jr. and K.S. testified that her brother maintains continuous contact with the two children through multiple phone calls each week as well as sending cards and letters. She has taken the children four or five times to see their father in prison. He tries to keep up with their progress. The children are very excited when their father calls, although at K.S.'s young age he generally wants to play and does not really understand talking on the phone. Both children address their father as "daddy," even though K.S. may not have a complete understanding of that. Nevertheless, both children have a bond with their father - D.S., Jr., more so than K.S. She did not believe that the children would be harmed in any way if the father were allowed to continue his relationship with his children.

She testified that she would be willing to keep the children under permanent guardianship. But when questioned by the Department's attorney, she explained that she needed to speak to her husband and her own children about it. As to adoption, she again was not certain, because it was a long-term commitment and she would have to "sit down and really talk about moving forward." Thus, she contradicted the Guardian's testimony that she was willing to adopt.

The trial court ultimately entered a judgment terminating both parents' rights to the children and giving custody to the Department for the purposes of adoption. As to the father, the court found the children were in permanent stable homes with their caregivers. P.S. has little contact with D.S. and did not wish to visit him. The court found that K.S. has no bond with D.S., although D.S., Jr. does have a strong bond with him. Incorrectly, the court found that D.S., Jr. had only two visits with the father during the years the children had been in care. While never specifically finding that the period of D.S.'s incarceration constituted a significant period, the court found that the evidence showed that the children should not have to wait another three years for their father to be released from prison.

The court also made findings on the factors required in section 39.810(1)-(11), Florida Statutes, including: (1) there was a suitable permanent custody arrangement with the aunt for D.S., Jr. and K.S. but

4

not for P.S.; (2) the father does not have the ability to provide for the children while incarcerated; (3) the father is not in a position to take the children now; (4) only D.S., Jr. has a slight bond with his father but there would be no harm in severing that bond, as the risk of returning him to his parents is greater; (5) the children are suitable for adoption, and the paternal aunt is "willing to consider" adoption, while the foster parents of P.S. want to adopt him; (6) the children have formed a bond with their caregivers, and keeping them in their current placement is desirable; and (7) the guardian recommends adoption.

The court found that termination of the father's rights was also the least restrictive means to protect the children. In explaining that finding, the court found that K.S. had no idea who his father was (contrary to the testimony of the aunt who said that K.S. did have some understanding that D.S. was his father). The court found P.S. has not shown any interest in having a relationship with D.S. D.S., Jr. did show a bond with his father, but the court found he was in need of permanency and should not have to wait for three more years until his father is released from custody. The court thus terminated the rights to the children and ordered all three children to be committed to the Department for purposes of securing their adoption. From this final judgment, the father appeals.

Termination of parental rights by the state requires clear and convincing evidence of: (1) a statutory ground for termination set forth in section 39.806, Florida Statutes; (2) that termination is in the manifest best interest of the child pursuant to section 39.810; and (3) that termination is the least restrictive means of protecting the child from harm. *See Padgett v. Dep't of Health & Rehab. Servs.*, 577 So. 2d 565, 570-71 (Fla. 1991). A finding of least restrictive means is required because "parental rights constitute a fundamental liberty interest." *Id.* at 571. Further, the determinations must be individualized to each child. *In re K.A.*, 880 So. 2d 705, 710 (Fla. 2d DCA 2004) ("[T]he trial court must individually determine whether the termination of parental rights to each child is permitted by the statute, is the least restrictive means to protect that child, and is in that child's manifest best interests."); *accord, S.L. v. Dep't of Children & Families*, 82 So. 3d 203, 204 (Fla. 4th DCA 2012).

The Department filed its petition to terminate D.S.'s parental rights to all three of his children, alleging as grounds for termination his incarceration for a significant period of the children's lives. Section 39.806(1)(d), Florida Statutes (2013), provides:

> (1) Grounds for the termination of parental rights may be established under any of the following circumstances:

* * *

(d) When the parent of a child is incarcerated and either:

1. The period of time for which the parent is expected to be incarcerated will constitute a significant portion of the child's minority. When determining whether the period of time is significant, the court shall consider the child's age and the child's need for a permanent and stable home. The period of time begins on the date that the parent enters into incarceration.

The prior version of this statute permitted termination of parental rights when a parent was incarcerated for a period constituting "a substantial portion of the period of time before the child will attain the age of 18 years."[1] § 39.806(1)(d)1., Fla. Stat. (2011). In *B.C. v. Florida Department of Children and Families*, 887 So. 2d 1046 (Fla. 2004), the supreme court interpreted this to mean the time of incarceration remaining when the petition for termination was filed, not the entire length of incarceration. But the court also noted that termination also must be in the manifest best interest of the child and the least restrictive means of protecting the child from harm. The court concluded that "termination cannot rest exclusively on the length of incarceration. The actual effect of incarceration on the parent-child relationship must also be considered in light of the additional statutory and constitutional requirements." *Id.* at 1054.

The amended statute appears to incorporate the concepts of *B.C.* that incarceration must be more than a quantitative analysis. Thus, the court must look both at the length of the incarceration as well as its effect on the child's need for permanency. In other words, the statute requires both a quantitative and qualitative dimension to the inquiry. In addition, however, the state must still prove that termination is in the manifest best interest of the child and the least restrictive means of protecting the child from harm.

---

[1] D.S. did not raise the issue of whether application of the amended statute would be an unconstitutional retroactive application of the statute, because D.S. was incarcerated prior to its effective date. We have concluded, however, that in this case the result should be the same regardless of which version of the statute is applied.

In percentage terms, the father's incarceration amounts to approximately 27% to 33% of the children's minorities, figures which *B.C.* would conclude does not constitute a "substantial" portion of the children's minorities. *See B.C.*, 887 So. 2d at 1054-55. Therefore, to be significant it must affect the children's need for permanency.

As to P.S., the state proved by clear and convincing evidence that the child is thriving in his foster family's care and does not wish to see his father. The father has not been able to maintain much contact with P.S. Thus, the father's incarceration has been significant in that P.S., at a young age, has become bonded with the foster family to the exclusion of D.S. The foster parents wish to adopt P.S. To deprive him of this continuing relationship with his foster parents would prevent him from achieving a permanent and stable home. Thus, the court's conclusion that the state proved a ground for termination is supported by competent substantial evidence. Moreover, for these same reasons, we conclude that termination was both in the manifest best interest and least restrictive means to prevent harm to P.S.

As to D.S., Jr. and K.S., the state has not proved this ground for termination. The children reside in a stable home with D.S.'s sister, their aunt. They are not in the custody of the Department or in foster care but in the care of a relative. Thus, to leave them in this placement would not allow them to languish in foster care. D.S. has maintained as close a relationship as his incarceration has allowed him to maintain with the children, and D.S., Jr., in particular. While the children are bonded to the aunt and uncle, they still know that D.S. is their father and have regular interaction with him, including regular phone calls, letters, and visits. When D.S. is released from prison, D.S., Jr. will be eleven and K.S. will be six. Because they are with relatives, they will still be in contact with their present caregivers even when D.S. is reunited with the children.

Other than the guardian ad litem and termination specialist simply stating that the children need permanency, there was no evidence of any harm that would occur to the children if they had to wait to be reunited with their father. They have not exhibited any signs of conflict or confusion. They have not been passed around from foster home to foster home. They have continued interaction with D.S., so he would not be a stranger to them when he is released.

Moreover, and importantly, contrary to the guardian's testimony, the aunt had not decided that she would adopt the children. By terminating the father's rights with the requirement of adoption, the court risks actually upsetting the goal that it intended to achieve of keeping the

children in their current placement with the aunt. Thus, because the evidence did not support a finding that the length of incarceration negatively impacted the children's need for permanency, the trial court's finding that D.S.'s incarceration amounted to a significant portion of the children's minorities as ground for termination was not supported by substantial and competent evidence.

In addition, the court did not apply the manifest best interest factors in accordance with the direction in *B.C.* that they must be applied with an appreciation of the restrictions of incarceration.

> In addition, the petitioner must allege, and the trial court must find, that termination is in the manifest best interests of the child. *See* §§ 39.802(4)(c), 39.810, Fla. Stat. (2003). *Termination of the parental rights of a parent who has played a supportive and beneficial role in the child's life despite the disabilities of incarceration probably would not meet these additional statutory and constitutional criteria. Cf. B.W.*, 498 So. 2d at 948 (stating that "efforts, or lack thereof," by incarcerated parent "to assume his parental duties through communicating with and supporting his children must be measured against his limited opportunity to assume those duties while imprisoned").

*B.C.*, 887 So. 2d at 1053 (emphasis added). First, it appears that the court weighed the availability of a suitable relative placement as supporting termination, when that factor actually works against termination of parental rights. As to the father's inability to support his children, the court overlooked D.S.'s uncontradicted testimony that he will be eligible for work release in less than two years, will have a job, and can contribute to his children's support while still incarcerated, but will also have the ability to support them when he is released. The court's conclusion that no bond existed between K.S. and D.S. was not supported by competent substantial evidence. The court relied on the guardian ad litem's conclusory statements, but the guardian never observed the interaction between D.S. and his children, even though she knew they talked often. It is also inconsistent with the aunt's testimony, based upon her observations of the children with D.S., that both children had a bond with their father, although K.S.'s bond was much less than D.S., Jr.'s. While the guardian supposed that the children were confused as to who was "daddy," no evidence was presented that this was so. Moreover, there was no evidence that the children would be harmed should they await reunification with their father. *See S.B. v. Dep't of Children & Families*, 132 So. 3d 1243, 1246 (Fla. 1st DCA 2014). No therapist testified that the

children were having issues, nor did any expert on child development testify as to any prognosis for these children. In fact, it appears that they are happy and well-adjusted and enjoy interacting with their father. In short, this case fits the description in *B.C.* where termination would not meet the additional statutory criteria of manifest best interest, because of the supportive role that D.S. has continued to play in the lives of D.S., Jr. and K.S.

Finally, the Department clearly failed to prove that termination was the least restrictive means to prevent harm. There was no evidence of harm to the children, who were being cared for by their aunt. "If DCF 'fails to prove that there is significant risk of harm to the current child, or that there are no measures short of termination that could be used to protect the child from harm, then termination will not pass constitutional muster.'" *A.H. v. Dep't of Children & Families*, 144 So. 3d 662, 665 (Fla. 1st DCA 2014) (quoting *J.B. v. Dep't of Children & Families*, 107 So. 3d 1196, 1202 (Fla. 1st DCA 2013)). In *A.H.*, the Department *conceded* that it had not proved that termination was the least restrictive means, where the children were being taken care of by a non-relative permanent guardian and there was no evidence that the mother's contact with the children posed any harm to them. *Id.* at 666. The Department should have made a similar concession in this case, where there was an available relative caregiver and no proof of any harm caused to the children by the contact with their father.

For the foregoing reasons, we affirm the termination of D.S.'s parental rights to P.S., but we reverse the termination of his parental rights as to D.S., Jr. and K.S. We remand for further proceedings in accordance with section 39.811(4), Florida Statutes.

MAY and GERBER, JJ., concur.

\*       \*       \*

***Not final until disposition of timely filed motion for rehearing.***

9