DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DEPARTMENT OF CHILDREN AND FAMILIES** and
**STATEWIDE GUARDIAN AD LITEM PROGRAM,**
Appellants,

v.

**J.S.,** the Father, and **S.I.,** the Mother,
Appellees.

No. 4D15-2272

[January 13, 2016]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Michael Heisey, Judge; L.T. Case No. 562011DP000024B.

Rosemarie Farrell, Orlando, for appellant Department of Children and Families.

Laura E. Lawson, Sanford, for appellant Statewide Guardian Ad Litem.

T. Charles Shafer, Fort Pierce, for appellee J.S., the Father.

Ryan Thomas Truskoski, Orlando, for appellee S.I., the Mother.

GERBER, J.

The Department of Children and Families and the Statewide Guardian Ad Litem Program appeal from the circuit court's final judgment denying the Department's petition for termination of both parents' parental rights. Regarding the father, the appellants argue the court erred in two respects: (1) finding that the father's incarceration period does not constitute a significant portion of the child's minority pursuant to section 39.806(1)(d)1., Florida Statutes (2015); and (2) finding that the father's continued parental relationship with the child would not be contrary to the child's best interests pursuant to section 39.806(1)(d)3., Florida Statutes (2015). Regarding the mother, the appellants argue the court erred in denying the termination of her parental rights based on its denial of the termination of the father's parental rights.

We agree with the appellants on the two arguments regarding the termination of the father's parental rights, and thus we reverse the denial of that termination. In light of that disposition, we also reverse the denial of the termination of the mother's parental rights.

Our opinion begins by summarizing the case's procedural history. We then present our reasoning as to why the father's parental rights should be terminated pursuant to sections 39.806(1)(d)1. and 39.806(1)(d)3.

*Procedural History*

The child was born in March 2009. The father did not have custody of the child for the next two years. In March 2011, when the child was two years old, the child was sheltered from the mother. The child was placed in the father's temporary custody. One month later, in April 2011, both parents consented to a dependency order.

In July 2011, the father violated the dependency order by taking the child to North Carolina without notice to the Department or the court. The court removed the child from the father's custody and placed the child with his maternal grandmother and half-sister in Broward County. The father remained in North Carolina.

Just over one year later, in August 2012, the father was arrested in North Carolina on four felony charges: robbery with a dangerous weapon, assault with a deadly weapon with intent to kill and inflict serious injury, and two counts of kidnapping. The charges arose from an incident where the father robbed two victims at gunpoint, shot one of the victims, and stole their car. The father was convicted on those charges and sentenced to prison in North Carolina with an anticipated release in August 2019. By that time, the child will be ten years old.

The father also has a criminal history in Florida. In 1989, he was sentenced to fifteen years in prison for attempted first degree murder, armed burglary of a dwelling, and shooting into an occupied dwelling.

The Department filed its termination of parental rights petition, seeking to terminate both the mother's and the father's parental rights. The mother failed to appear at the advisory hearing, resulting in a consent by default on the ground of abandonment. The Department pursued its petition against the father.

At the adjudicatory hearing, the father appeared by telephone. During the Department's case-in-chief, the court heard testimony from the child's

2

maternal grandmother, the Department's case manager, and the guardian ad litem.

The grandmother testified that the child is thriving with his half-sister in the grandmother's home. The grandmother adopted the child's half-sister, and she wants to adopt the child as well. According to the grandmother, the father's only contact with the child has been one letter sent via the case manager six months before the adjudicatory hearing. The father has not sent the child any cards, gifts, food or clothing. The child receives only the father's $183 monthly Social Security benefits.

The dependency case manager testified that she visits the child about every three weeks. The child is very affectionate towards his grandmother. They have formed a loving, parent-child relationship. According to the case manager: "[The child] often just runs up to her and hugs her and sits on her lap and tells her he loves her. He calls her mom. They play together. They seem to be very close." The child never has asked about the father in the case manager's presence.

The case manager was required to contact the parents, if possible, on a monthly basis. She last spoke with the father six months before the adjudicatory hearing. During that conversation, the father indicated that, upon his release from prison, he planned to stay in North Carolina.

After that conversation, the case manager attempted to call the father three or four times, but did not get through. The case manager testified: "He was moved to a different facility and they've made it known to me that they won't allow him to speak to me." She had not tried to communicate with him in writing.

The case manager could not remember if she talked to the father about the full case plan, but she remembered talking to him about a parenting class which he completed. The father's other tasks were to: maintain monthly contact with the case manager; provide the case manager with any change of address or phone number; and provide financial support for the child. According to the case manager, the father never provided any change of address or phone number, and never provided financial support. The case manager opined that the father had not substantially complied with his case plan.

The case manager recommended that the court terminate both parents' rights as to the child. The case manager conceded that, to her knowledge, the only incident where the father directly harmed the child occurred when the father left the state with the child without notifying the Department or

the court. However, according to the case manager, based on her training and risk assessment regarding child safety, and her knowledge of this case, she did not believe the child would be safe if the court returned the child to the father's care.

After the case manager testified, the father, who was appearing telephonically from prison and had not offered any testimony, stated he had "nothing else to say" and ended the call.

The hearing then resumed with the guardian ad litem's testimony. The guardian ad litem testified she visited the child monthly for four years. She described the child's relationship with the grandmother as "a very comfortable, loving relationship," and as a "parental" and "bonded interaction." The child also has a very close relationship with his half-sister. The child never has asked for his father or mother. The guardian opined that it would be detrimental to the child to remove him from the grandmother's care.

Both the Department and the guardian argued that, after four years of dependency, the child was entitled to permanency, and that it would be in the child's best interests to terminate both parents' rights and allow the child to be adopted by his grandmother and remain with his half-sister. The Department noted that during the four-month period when the father had custody, he acted with wanton disregard for the child's safety and welfare when he violated a court order by absconding with the child to another state without disclosing the child's whereabouts. The Department added that since the child's removal from his father's care in 2011, he had not seen or spoken to his father; the father had not provided any financial or emotional support to him; he does not know his father; and he has no relationship with the father. The Department also noted the father would be incarcerated for a significant portion of the child's minority, as the child would be ten years old when the father is scheduled to be released in 2019.

The father's counsel argued that, despite the father's incarceration, no evidence existed that he had neglected or harmed the child, or would be a danger to the child. The father's counsel noted that the father wrote a letter to the child but received no response; his communication ability is limited due to his incarceration; and the child receives the father's monthly social security benefit.

At the end of the hearing, the circuit court orally announced it was denying the petition for termination of parental rights. The court found: the Department did not prove by clear and convincing evidence that the father breached his case plan; the father completed the case plan's

primary task of a parenting class; the other "secondary" tasks were not fully explained to the father; and the father's incarceration was not a willful violation of his other case plan tasks because his current prison facility "made it almost impossible for the case manager to have contact with him. So, likewise, it would be impossible for him to have contact with her."

Regarding section 39.806(1)(d)1., which concerns whether the parent's incarceration constitutes a significant portion of the child's minority, the court found:

> Based on the calculations that we can do from the evidence that was ascertained at trial, this child will be somewhere [between] ten to twelve [years old] when [the] father [is] released. Although it is a very close call, the Court does not find clear and convincing evidence . . . that's a significant portion of this child's minority. He'll still have seven-and-a-half more years or so until he reaches the age of majority after his father is released.

Regarding section 39.806(1)(d)3., which concerns whether the child's continued relationship with an incarcerated parent would be contrary to the child's best interests, the court found:

> [T]he only contact that the child could have with his father while incarcerated would be telephonic contact and that's not even guaranteed, depending on what the particular rules of whatever facility he is being housed in. This child is currently six years of age. Although the current charges and the prior record are disturbing and of a violent felony nature, there's been no evidence that, by virtue of the charges themselves, that the current charges or the criminal history would cause any harm to this child.

The court also found the Department did not prove by clear and convincing evidence that the father engaged in conduct towards the child which demonstrated his continued involvement with the child would threaten the child's "life, safety, well-being or physical or mental, emotional health," irrespective of provisions of services.

The court later entered a written order on the petition. The court found:

> [Subsection] (1)(d)[1.] considers whether the incarceration of a parent constitutes a significant portion of the child's minority. The father was arrested on August 2, 2012, and his

5

expected release date is August 2019. At the time of his arrest, the child was 4 years old.[1] Once released, the father would have spent approximately 7 years of the child's minority incarcerated. The Court does not find clear and convincing evidence that approximately 7 years constitutes a significant portion of the child's minority. The father was a part of the child's life until his most recent incarceration. The child was even placed with the father after the child was sheltered from the mother.

As to [subsection] (1)(d)[3.], whether or not the continued relationship with the incarcerated parent would be contrary to the best interests of the child[, t]he most likely contact the child will have with the father while incarcerated would be telephonic or written contact. The child is currently 6 years of age, and although the current charges and the prior criminal record are disturbing and of a violent felony nature, there has been no evidence presented that continued contact with the father would cause any harm to this child.

Regarding the mother, the court found the Department proved by clear and convincing evidence that she abandoned the child pursuant to section 39.806(1)(b), Florida Statutes (2015), and that she did not comply with her case plan within twelve months and materially breached her case plan pursuant to sections 39.806(1)(e)1. and 2., Florida Statutes (2015). However, the court denied the termination of the mother's parental rights because the court found insufficient evidence existed to support a single-parent termination under sections 39.811(6)(e) and 39.806(1)(i), Florida Statutes (2015).

The Department filed a motion for rehearing, which the guardian supported. The motion argued the Department proved by clear and convincing evidence that the court should have terminated the father's parental rights under sections 39.806(1)(d)1. and 39.306(1)(d)3.

The court set a rehearing on the motion. At the rehearing, the Department emphasized that the father's incarceration affects the child's need for permanency, even though the child currently was placed with a relative:

This is the only home that [the child] has ever known. He's been in this placement with his sister. His sister has already

---

[1] In fact, the child (born in March 2009) was 3 years old.

been adopted . . . . [I]f we allow [the child] to sit in limbo for four years, he will live with that uncertainty that he may not be staying in this home, that [the father] may come back one day, this person that he doesn't really know and has no relationship, and take him away. And so I would argue . . . that it's not a permanent placement, because he will never be guaranteed to remain in this home, unless he is adopted.

The court denied the motion.

This appeal followed. Regarding the father, the appellants argue that the circuit court erred in two respects: (1) finding that the father's incarceration period does not constitute a significant portion of the child's minority under section 39.806(1)(d)1.; and (2) finding that the father's continued parental relationship with the child would not be contrary to the child's best interests under section 39.806(1)(d)3. Regarding the mother, the appellants argue the court erred in denying the termination of her parental rights based on its denial of the termination of the father's parental rights.

We agree with the appellants' arguments, as explained in the two sections below.

*1. The circuit court erred in finding that the father's incarceration period does not constitute a significant portion of the child's minority under section 39.806(1)(d)1.*

Section 39.806(1)(d)1. provides, in pertinent part, that grounds for the termination of parental rights may be established:

(d) When the parent of a child is incarcerated and . . .

1. The period of time for which the parent is expected to be incarcerated will constitute a significant portion of the child's minority. When determining whether the period of time is significant, the court shall consider the child's age *and the child's need for a permanent and stable home.* The period of time begins on the date that the parent enters into incarceration[.]

§ 39.806(1)(d)1., Fla. Stat. (2015) (emphasis added).

As we recently explained in *D.S. v. Department of Children & Families*, 164 So. 3d 29 (Fla. 4th DCA 2015):

The prior version of this statute permitted termination of parental rights when a parent was incarcerated for a period constituting "a substantial portion of the period of time before the child will attain the age of 18 years." § 39.806(1)(d)1., Fla. Stat. (2011). In *B.C. v. Florida Department of Children and Families,* 887 So. 2d 1046 (Fla. 2004), the supreme court interpreted this to mean the time of incarceration remaining when the petition for termination was filed, not the entire length of incarceration. But the court also noted that termination also must be in the manifest best interest of the child and the least restrictive means of protecting the child from harm. The court concluded that "termination cannot rest exclusively on the length of incarceration. The actual effect of incarceration on the parent-child relationship must also be considered in light of the additional statutory and constitutional requirements." *Id.* at 1054.

The amended statute appears to incorporate the concepts of *B.C.* that incarceration must be more than a quantitative analysis. Thus, *the court must look both at the length of the incarceration as well as its effect on the child's need for permanency. In other words, the statute requires both a quantitative and qualitative dimension to the inquiry.* In addition, however, the state must still prove that termination is in the manifest best interest of the child and the least restrictive means of protecting the child from harm.

*Id.* at 34 (emphasis added; footnote omitted).

Here, while the circuit court made findings regarding the child's age (the quantitative inquiry), it did not make findings regarding "the child's need for a permanent and stable home" (the qualitative inquiry) as the statute mandates. The failure to make statutorily-mandated findings in termination of parental rights proceedings is reversible error. *Cf. L.M. v. Dep't of Children & Families*, 20 So. 3d 408, 409-10 (Fla. 4th DCA 2009) (reversing and remanding for trial court to consider and address all six factors of section 39.621(10), Florida Statutes, which "mandates that [the] six factors 'be considered and addressed in the findings of fact of the order on the motion [by a parent for reunification].'").

Furthermore, competent substantial evidence does not exist to support the circuit court's finding that the period of time for which the father is expected to be incarcerated will not constitute a significant portion of the

child's minority. The record does not reflect, as the court found, that the father was "part of the child's life until his most recent incarceration." Rather, the Department's evidence established that the father had custody of the child for only four months when the child was two years old, during which time the father absconded with the child. Also, no evidence exists that the father tried to communicate with the child except for one letter which the father sent to the child six months before the adjudicatory hearing.

More importantly, the Department proved by clear and convincing evidence that the length of the father's incarceration would negatively affect the child's need for permanency. As the Department argued, the only home which the child has ever known is with his grandmother and half-sister, whom the grandmother already has adopted. The failure to terminate the father's parental rights would cause the child to sit in limbo for the next four years, during which the child may realize that he may not be staying in his home if the father, with whom he has no relationship, comes back and takes him away. Terminating the father's parental rights allows the child to be adopted by his grandmother and have permanency.

Thus, the Department proved by clear and convincing evidence that the father's incarceration was for a significant portion of the child's minority and negatively affected the child's need for permanency. For these same reasons, termination was both in the child's manifest best interest and the least restrictive means to prevent harm to the child. *Cf. B.K. v. Dep't of Children & Families*, 166 So. 3d 866, 876-77 (Fla. 4th DCA 2015) (affirming the termination of the father's parental rights where the incarcerated father had not seen his child for six years and spoke to the child only once, the child did not know who his father was and would be faced with continued foster care if termination were denied, and no parent-child relationship existed to reestablish).

The father attempts to liken his case to *D.S.* However, *D.S.* does not support the father's position. In *D.S.*, the father had three children who were sheltered. 164 So. 3d at 31. Two of the three children (D.S., Jr., and K.S.) were placed with their paternal aunt, and the middle child, P.S., was placed in foster care. *Id.* This court affirmed the termination as to the child in foster care, stating:

> As to P.S., the state proved by clear and convincing evidence that the child is thriving in his foster family's care and does not wish to see his father. The father has not been able to maintain much contact with P.S. Thus, the father's incarceration has been significant in that P.S., at a young age,

9

has become bonded with the foster family to the exclusion of [the father]. The foster parents wish to adopt P.S. To deprive him of this continuing relationship with his foster parents would prevent him from achieving a permanent and stable home. Thus, the court's conclusion that the state proved a ground for termination is supported by competent substantial evidence. Moreover, for these same reasons, we conclude that termination was both in the manifest best interest and least restrictive means to prevent harm to P.S.

*Id.* at 34-35. As for the two children who lived with the paternal aunt, this court found that the state had not proven subsection (1)(d)1. was a ground for termination:

The children reside in a stable home with [the father's] sister, their aunt. They are not in the custody of the Department or in foster care but in the care of a relative. Thus, to leave them in this placement would not allow them to languish in foster care. [The father] has maintained as close a relationship as his incarceration has allowed him to maintain with the children, and D.S., Jr., in particular. While the children are bonded to the aunt and uncle, they still know [who] their father [is] and have regular interaction with him, including regular phone calls, letters, and visits. When [the father] is released from prison, D.S., Jr. will be eleven and K.S. will be six. Because they are with relatives, they will still be in contact with their present caregivers even when [the father] is reunited with the children.

*Id.* at 35. This court noted "the supportive role that [the father] ha[d] continued to play in the lives of D.S., Jr. and K.S." *Id.* at 36. The children were "happy and well-adjusted and enjoy[ed] interacting with their father." *Id.* In short, there was no evidence that awaiting reunification with their father would cause those two children any harm. *See id.*

Here, in contrast, no relationship exists between the father and the child, and the record reflects almost no effort from the father to be a part of his son's life. Instead, the child here may be compared to the child in foster care in *D.S.* Like that child, the child here is thriving in his current placement, his father has not maintained contact with him, he has become bonded with his caregiver at a young age to the exclusion of the father, his caregiver wants to adopt him, and to deprive him of this continuing relationship with his caregiver and his half-sister, whom his caregiver has already adopted, would prevent him from achieving a permanent and

10

stable home. Thus, the state proved grounds for termination under section 39.806(1)(d)1., and termination was both in the manifest best interest and the least restrictive means to prevent harm to the child.

> *2. The circuit court erred in finding that the incarcerated father's continued parental relationship with the child would not be contrary to the child's best interests under section 39.806(1)(d)3.*

Section 39.806(1)(d)3. provides, in pertinent part, that grounds for the termination of parental rights may be established:

> (d) When the parent of a child is incarcerated and . . . :
>
> . . . .
>
> 3. The court determines by clear and convincing evidence that continuing the parental relationship with the incarcerated parent would be harmful to the child and, for this reason . . . termination of the parental rights of the incarcerated parent is in the best interest of the child. When determining harm, *the court shall consider the following factors*:
>
> a. The age of the child.
>
> b. The relationship between the child and the parent.
>
> c. The nature of the parent's current and past provision for the child's developmental, cognitive, psychological, and physical needs.
>
> d. The parent's history of criminal behavior, which may include the frequency of incarceration and the unavailability of the parent to the child due to incarceration.
>
> e. Any other factor the court deems relevant.

§ 39.806(1)(d)3., Fla. Stat. (2015) (emphasis added).

Here, the Department proved by clear and convincing evidence that the statutorily-mandated factors favored termination of the father's parental rights. The circuit court, however, apparently looked past that evidence and did not address the statutorily-mandated factors in four respects.

11

First, the court did not address the relationship between the child and the father under subsection (1)(d)3.b.  The Department proved by clear and convincing evidence that the father and the child have no relationship.

Second, the court did not address the father's current and past provision for the child's developmental, cognitive, psychological and physical needs under subsection (1)(d)3.c.  The Department proved by clear and convincing evidence that the father did not provide for the child's needs in any way except for the involuntary redistribution of the father's Social Security benefits.  If anything, the father negatively affected the child's needs by absconding with the child out of state for four months.

Third, regarding the father's history of criminal behavior under subsection (1)(d)3.d., the court merely noted that the father's commission of armed burglaries and felony assault with a firearm resulting in injury is "disturbing."  The court did not address the fact that this was the father's second conviction for armed violent offenses or how the resulting incarceration caused his prolonged unavailability to parent.

Fourth, while the court mentioned the child's age under subsection (1)(d)3.a., the court did not address the child's age when considering the harm flowing from the father's prolonged unavailability to parent.

As stated above, the failure to make these statutorily-mandated findings in termination of parental rights proceedings is reversible error. *L.M.*, 20 So. 3d at 409-10.  More importantly, however, the Department proved by clear and convincing evidence that, by applying the statutorily-mandated factors, continuing the parental relationship with the incarcerated father would be harmful to the child and, for this reason, termination of the father's parental rights is in the child's best interests.

*Conclusion*

Based on the foregoing, we reverse the denial of the termination of the father's parental rights.  In light of that disposition, we also reverse the denial of the termination of the mother's parental rights.  We remand for the circuit court to enter a final judgment:  (1) terminating the father's parental rights as to the child pursuant to sections 39.806(1)(d)1. and 39.806(1)(d)3., Florida Statutes (2015); and (2) terminating the mother's parental rights as to the child pursuant to sections 39.806(1)(b) and 39.806(1)(e)1. and 2., Florida Statutes (2015).

*Reversed and remanded for entry of termination of parental rights.*

GROSS and KLINGENSMITH, JJ., concur.

* * *

***Not final until disposition of timely filed motion for rehearing.***