DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**B.K.,** The Father,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES,**
Appellee.

No. 4D14-3222

[May 20, 2015]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Hope Bristol, Judge; L.T. Case No. 2008-009868 CJ DP.

Lori D. Shelby, Fort Lauderdale, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Carolyn Schwarz, Assistant Attorney General, Fort Lauderdale, for appellee Department of Children and Families.

Patricia Murphy Propheter, Sanford, for appellee Guardian Ad Litem Program.

*ON MOTION FOR CLARIFICATION*

WARNER, J.

We grant the motion for clarification, withdraw our previously issued opinion and substitute the following in its place.

A father appeals the trial court's final judgment terminating his parental rights as to his daughter. He claims that his incarceration, upon which termination was based, was not for a significant portion of the child's life, so as to warrant termination. Moreover, he argues termination was not the least restrictive means of preventing harm to the child. Concluding that the trial court's rulings were supported by competent substantial evidence, we affirm the final judgment.

B.K.'s daughter, S.C., was born in October 2008. She was sheltered about a week later, after her mother tested positive for drugs and a

sexually transmitted disease, which the mother imparted to S.C. The mother identified B.K. as the father. The Department of Children and Families stepped in, and, after a paternity test confirmed B.K.'s fatherhood, both parents consented to the dependency.

While the child was in foster care, the father kept in touch with the foster parents and arranged two supervised visits with S.C. His interaction with his child during those visits was appropriate. Unfortunately, in March of 2009, he was convicted of several drug-related crimes, which he committed before S.C.'s birth. He was sentenced to consecutive five-year terms of imprisonment. His projected release date is in early 2017.

S.C. remained in foster care until 2010, when the dependency case was closed and the mother regained custody of S.C. As to B.K., the order of permanency stated only that visitation between S.C. and B.K. should continue to be supervised. Other than that, the order provided for a permanency goal of reunification with the mother.

While S.C. was in foster care, B.K. wrote to her foster parents from prison in order to keep in touch with the child. After S.C. was reunited with her mother, B.K. wrote to S.C. and the mother, but the mother did not make any contact with him. B.K. happened to be housed at the same prison as the mother's brother, so he was able to continue to keep up with S.C.'s life, and he sent her letters and birthday cards.

Between 2009 and 2013, the mother gave birth to two little boys by different fathers. In June 2013, the Department sheltered all three children, due to the mother's substance abuse and domestic violence in the home. B.K. again became part of those proceedings. B.K. wrote to the court in August 2013, stating:

> I plan to be a full time father for my daughter upon my release and I am making the necessary preparations while imprisoned. I should be in work release in 18 months. At that point I would like supervised visits with my daughter. . . . If possible can the court please send me pictures of my daughter. . . . When I was released on bond in early 2009 I was participating in family dependency court, taking parenting classes, and providing ua [sic] samples. . . . Unfortunately I lost trial [sic] and was sentenced to 10 years. My daughter is all I have, I beg the courts to let me be a part of her life.

Nevertheless, the Department filed a petition to terminate the parental rights ("TPR") to S.C. of both the mother and B.K. Regarding B.K., the only

2

ground alleged for termination of parental rights was under section 39.806(1)(d)1, Florida Statutes: that B.K. was expected to be incarcerated for a significant portion of S.C.'s minority. S.C. was placed with the same foster family as her half-brothers in September 2013.

The court held the final hearing on termination in July 2014. Halfway through the proceedings, the mother consented to termination of her rights to all three children. B.K., however, contested termination. The Department placed into evidence B.K.'s judgment and sentence of ten years. The Department called the children's guardian ad litem ("GAL") who testified that she had met with the children about ten times, and they were all happy and well-adjusted. She had not met B.K., except in court, because of his incarceration. She knew of at least one phone call that B.K. had with S.C. in 2014 which went well. And she knew that he had written many letters to S.C. as well as to the foster parents. She did not know of any bond between S.C. and B.K., but she had never asked S.C. whether she wanted to have a relationship with her father. She opined the children had formed a significant relationship with the parental substitutes, and it was desirable to maintain continuity of this placement.

The GAL noted that S.C. was seeing a therapist weekly. The therapist felt S.C. was old enough to express a preference regarding placement, but S.C. "did not want to decide. She didn't want that on her shoulders." The therapist did not testify. The GAL opined that neither the children's mother nor their fathers had the capacity to care for the children to the extent that the children's health, safety and well-being would not be in danger if the children were returned to their parents' care. She further testified that the children would not suffer any harm if a TPR was entered.

The children did not have any emotional or behavioral problems that would be a barrier to adoption or prolonged foster care. The GAL testified the foster family was willing to adopt, and this would be a fast way to achieve permanency for the children. The GAL opined that future contact with either parent should be at the discretion of the adoptive family, but she believed they would be open to it as long as it was appropriate for the children.

The children's foster mother testified she had been the foster mother for S.C. since the end of September 2013, when S.C. joined her half-brothers who had been living with the foster family since June. All three children had been living together, and they had become "super, super, super close . . . as close as any brother and sisters." The entire foster family had bonded with the children and were willing to adopt all three.

3

The foster parents had not received any financial support for S.C. from her father, B.K. While B.K. had not provided financial support, B.K. had been in communication with both S.C. and the foster mother. The foster mother described letters B.K. had sent S.C.: "They're pictures. So it's hearts and he traced his hand once and writes her name and a Hello Kitty picture. So she hangs them on her walls." The foster mother described S.C.'s reaction to the letters from her father:

> [S]he saw her dad's hand and she was like "wow". She put up her hand to it and, you know, it's a maze [sic] and there is you know, like wow. And she likes Hello Kitty and she likes seeing her name.
> I mean, anybody who gets a letter is like, you know? Everybody loves mail. So she was happy to receive the art.

B.K. had also written to the foster mother to thank her for taking care of S.C., and to tell her he was interested in calling.

The Department took a considerable period of time to arrange a phone call between B.K. and S.C. Finally, in March 2014, B.K. was able to speak with his daughter. The foster mother observed the call. Beforehand, the foster mother told S.C. that her dad would be calling, and S.C. "was excited because she had received letters from him." Although the foster mother did not think that S.C. really knew who B.K. was, the call was pleasant. S.C. sang songs to her father and recited the alphabet. He told her he loved her, and she said she loved him. The foster mother opined that S.C. was happy during the phone call, but stated, "Any time she gets to talk on the phone she's happy with whoever's she [sic] talks to." B.K. had tried to call S.C. one other time, but S.C. was taking a nap and the foster mother did not wake her up. She noted B.K. had indicated that he would try to call again, and she may have missed the call.

After the phone call and letters, S.C. never asked the foster mother questions about B.K. The foster mother believed S.C. did not know who she was talking to on the phone because of an incident described by the GAL, where S.C. "thought that those pictures on her wall were [from her half-brother's father]. She assumed that [her brother's father] was the person that she, you know, had talked to and had written her those letters."

The foster mother opined that continued visitation with the mother would be "very beneficial for" the children because "[t]hey love her. She loves them." Regarding visitation with the fathers, however, the foster mother was "not as interested" because she "just [didn't] feel the need."

4

She explained, "The children are happy. The[y] don't have a relationship with the fathers. There's nothing - - There's nothing there. So - - So to start something I'm not as - - not as eager." But if S.C. wanted to contact her father, the foster mother testified she would allow that.

The Department presented no other witnesses, other than a TPR advocate who testified that no possible relative placements had been found. The only other evidence it offered were multiple letters that B.K. had written to S.C. during the past year.

The child advocate assigned to the case between March 2013 and January 2014, just after the children were sheltered in 2013, testified on B.K.'s behalf. She testified that B.K. had spoken to her multiple times during court proceedings, inquiring about how S.C. was doing, how he could get letters and pictures to her, and if he could have a case plan. When the TPR proceedings started, B.K. would call her and wrote her a three-page letter about S.C. and his case plan tasks. She helped to arrange the telephone calls between B.K. and S.C. B.K. was supposed to have his initial telephone visit in 2013, even though it didn't occur until 2014 because of miscommunication by the Department. B.K. often expressed to her that he loved S.C. and that he would be willing to complete a case plan to obtain custody of S.C. The testimony of the current child advocate, also called by B.K., likewise supported the fact that B.K. continually asked about the child and wanted to be a part of her life.

The child advocate assigned to the case between October 2008 and September 2010 also testified. Prior to being incarcerated in March 2009, B.K. contacted her five or six times. After his incarceration, he wrote her letters once or twice. She supervised two visits between B.K. and S.C. in January and February of 2009, when S.C. was several months old. B.K. brought clothing for S.C. to one of the visits. S.C. was too young for her to determine whether S.C. was developing a bond with B.K. She did not remember B.K. ever being scheduled for a visit and not showing up.

B.K. testified he would be released from prison sometime near the beginning of 2017, depending on gain time. He believed he was currently eligible for work release but that it was on hold due to the pending TPR case; he had been held in the Broward County Jail since August 2013 to attend TPR hearings, and so he was not earning gain time.

He planned to get back into S.C.'s life by completing a case plan, such as by taking parenting classes, finding employment, and maintaining appropriate housing. He testified he could not do those things while incarcerated, but opined, "[O]nce I get to work release, you know, I have a

trade, I install hurricane impact windows and doors. I ran my own business. I - - I made excellent money, you know. I'm just locked up at the time. So I know it looks really bad." Nevertheless, he had no doubts or fears about being able to make a living in that way, due to his previous experience and contacts in that business.

He testified it had been "very difficult" to be in S.C.'s life while he was incarcerated, but he tried to maintain contact with all of her foster parents and the mother. When he was first incarcerated in 2009, he was corresponding with S.C.'s then foster parents "bi-weekly. They would send me pictures of her and they were writing me letters of encouragement and things like that."

He explained why he thought that it was not in S.C.'s best interest for his parental rights to be terminated:

> Well, first of all I'm her father. And I heard testimony today about how well she's doing in her foster parent's home and those foster parents didn't know her.
> When they met her she was four. They never, you know, talked to her or knew anything about her but in a short period of time they demonstrated how much that she loves them and how she became part of their household.
> But me as their father, you know, at least I've changed her before and I fed her, you know, and to think I can't build that same bond that they did, you know, I don't understand that being I'm her father and at least I have some kind of, you know, I know her a lot more than they do. . . .
> So she's looking for her daddy. She wants to know who's drawing all these pictures and who's she talking to? She wants to know. . . .

He showed the trial court pictures that S.C. had drawn and sent to him in prison—an Easter card and a Father's Day card.

B.K. admitted that a bond existed between the foster parents and S.C., but still maintained that he should be involved in his child's life and that she needed to know her own father. When the Department asked whether B.K. believed S.C. should be reunified with him when he was no longer incarcerated in 2017, he responded:

> No, that's not my testimony. My testimony is as her father I think it is very important for me to be a part of her life. She has -- Now she has three other siblings. All of them need to

6

be under one roof.  All four of them need to be under one roof.
. . .

What I'm saying is I think I should be allowed to be in my daughter's life.  I think I should be allowed to visit her.  I should be allowed to go to her soccer games, to go to her birthday's parties [sic].  She should be allowed to call me on the phone anytime she wants to.

Now if the Department wants me to jump through hoops to take drug tests and things like that, I have no problem with that.  They want me to get back in family dependency court, I have absolutely no problem with that.  They want me to make a certain amount of money, I don't have a problem with that.

He then clarified:

I want to be -- I want to be reunified with my daughter but at the pace that it doesn't disrupt what she has going on with the foster parents.

It doesn't disrupt what she has going on with her brother's [sic] and everything.  I want it to be a smooth transition.

I don't want to just come in here and say, "Come on baby, you're coming with me."  I wouldn't do that to her.  I know she has a bond with [her foster] sisters and with her brothers.  I know she has a bond with her foster parents.  That's not what I'm here to do.

Despite B.K.'s earnest entreaties, the trial court terminated his parental rights to S.C.  It found that he would be incarcerated for a significant portion of her minority, and that B.K. did not have a bond with her.  The court found S.C. didn't really know him at all, nor was there anything but speculation that B.K. could develop a relationship with his daughter.  The child was happy in her foster home and with her siblings, and "[t]o remove her from them in the hopes that there can possibly be a reunification with [B.K.] some years down the road would cause her much emotional pain."  The court found:

There is little to no evidence to support the re-establishment of the parent/child relationship between [B.K.] and [S.C.] as there hasn't even been an initial establishment of a relationship between them.  The termination of his parental rights and duties to [S.C.] is the least restrictive means of protecting her from harm.  She has not seen her father since she was months old [sic] and she does not know who he is.

7

The court then reviewed the factors in section 39.810(1)-(11), Florida Statutes, regarding the manifest best interests of the child. The court found there was no suitable custody arrangement with a relative of the minor children. B.K. had not provided any support for S.C. and would remain incarcerated until 2017. S.C. had "no bond with her father, [B.K.]. She does not know who he is. She understands the concept that 'her father' has sent her letters, but she does not know who that is. She believed it to be [the father of her half-sibling] when she [sic] was on a visit with [her half-sibling]." The court found the children had bonded with the foster parents, it would be detrimental to remove them, and S.C. would suffer no harm if B.K.'s parental rights were terminated. B.K. timely appeals the final judgment terminating his parental rights.

B.K. makes three arguments seeking to reverse the final judgment terminating his rights. First, he claims that the Department failed to prove that he has been incarcerated for a significant portion of the child's minority. Second, he argues that termination of parental rights is not in the manifest best interest of the child because the father has parented as well as he can from prison, and the child is developing a bond with him. Third, he maintains that terminating his parental rights is not the least restrictive means of protecting the child from harm. We address each argument.

A parent has a fundamental liberty interest in the care, custody and companionship of his child. *See Padgett v. Dep't of Health Rehab. Servs.*, 577 So. 2d 565, 570 (Fla. 1991). The only limitation on this right is "the ultimate welfare of the child itself[.]" *Id.* (quoting *State ex rel. Sparks v. Reeves*, 97 So. 2d 18, 20 (Fla. 1957)). Thus, to terminate a parent's rights in his or her child, the state must first meet the statutory requirements to prove a statutory ground for termination and prove that termination is in the manifest best interest of the child. *See* §§ 39.806, 39.810, Fla. Stat. (2012). Then, to satisfy constitutional concerns, it also must prove that termination is the least restrictive means to protect the child from serious harm. *See Padgett*, 577 So. 2d at 571. The state must present clear and convincing evidence to support each element. "Appellate courts review orders terminating parental rights using a 'highly deferential' standard of review: '[t]hat is, 'a finding that evidence is clear and convincing enjoys a presumption of correctness and will not be overturned on appeal unless clearly erroneous or lacking in evidentiary support.'" *J.E. v. Dep't of Children & Families*, 126 So. 3d 424, 427 (Fla. 4th DCA 2013) (quoting *D.P. v. Dep't of Children & Family Servs.*, 930 So. 2d 798, 801 (Fla. 3d DCA 2006)).

### *Whether B.K. will be incarcerated for a significant portion of the child's minority*

Measured from the time he was first incarcerated, when B.K. is scheduled for release he will have been in prison for nearly eight and a half years of S.C.'s life. The Department petitioned for termination of B.K.'s parental rights based solely on his incarceration for a significant portion of S.C.'s minority, in accordance with section 39.806(1)(d)1, Florida Statutes. That statute provides as a ground for termination:

> (d) When the parent of a child is incarcerated and . . .
>
> 1. The period of time for which the parent is expected to be incarcerated will constitute a significant portion of the child's minority. When determining whether the period of time is significant, the court shall consider the child's age and the child's need for a permanent and stable home. The period of time begins on the date that the parent enters into incarceration[.]

Before July 1, 2012, when the foregoing section became law, section 39.806(1)(d)1., Florida Statutes (2011), provided as a ground for termination of parental rights when "[t]he period of time for which the parent is expected to be incarcerated will constitute a *substantial* portion of the period of time before the child will attain the age of 18 years[.]" § 39.806(1)(d)1., Fla. Stat. (2011) (emphasis added).[1] The supreme court

---

[1] Both parties have proceeded upon the assumption that the 2012 amendments to section 39.806(1)(d) apply to this case, although B.K. was incarcerated before their enactment. Whether this constitutes a retroactive application of the statute was not raised in the trial court or otherwise considered until this court requested supplemental briefing. After reviewing the issue, we conclude that it was not preserved, as it would amount to an unconstitutional application of a facially valid statute which must be preserved by raising the issue in the trial court. *See B.C. v. Dep't of Children & Families*, 864 So. 2d 486, 491 (Fla. 5th DCA 2004). Even if it had been raised, we conclude that it is not an unconstitutional retroactive application, as a parent's incarceration was a ground for termination of parental rights when B.K. was originally incarcerated. The statutory changes to the length of incarceration necessary to terminate rights, as well as the explicit listing of various factors impacting the incarcerated parent-child relationship, are remedial in nature, as they were adopted to protect the child, not punish the parent further. *See, e.g., In re A.V.*, 113 S.W.3d 355, 360-61 (Tex. 2003) (allowing retroactive application of TPR provision based on incarceration, reasoning the state was "not pursuing a retributive or punitive aim, but a 'purely remedial function: the protection of minors'"). Parental rights are not absolute and may

interpreted this provision in *B.C. v. Florida Department of Children and Families*, 887 So. 2d 1046 (Fla. 2004). It concluded that the statute required consideration of only the period of incarceration to be served after the petition for termination is filed. *Id.* at 1047.

The court in *B.C.* emphasized that section 39.806(1)(d)1., "must be read in light of *Padgett's* requirement . . . that 'the state must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child,' and that 'termination of parental rights is the least restrictive means of protecting the child from harm.'" *Id.* at 1053 (quoting *Padgett*, 577 So. 2d at 571, and *Fla. Dep't of Children & Families v. F.L.*, 880 So. 2d 602, 608 (Fla. 2004)). It held, "[T]ermination cannot rest exclusively on the length of incarceration. The actual effect of incarceration on the parent-child relationship must also be considered in light of the additional statutory and constitutional requirements." *Id.* 887 So. 2d at 1054.

In analyzing the facts at issue in *B.C.*, the court noted that the four years remaining on the father's sentence at the time the TPR petition was filed, did not constitute a substantial portion of the remaining fourteen-year minority of the child; the court noted this amounted to only 28.6% of the remaining minority. *Id.* Courts following *B.C.* appeared to take largely a numerical approach to determining whether the time of incarceration was "substantial." *See, e.g.*, *W.W. v. Dep't of Children & Families*, 811 So. 2d 791, 792 (Fla. 4th DCA 2002) (where appellant's incarceration was to end within several months after entry of TPR judgment, and appellant would have served "[f]ifty-four months . . . after the birth of the first child," who was then eight years old, the father had not been incarcerated for a "substantial portion" of his children's minority).

The 2012 statutory amendment changed the calculation of incarceration time. It now measures the length of incarceration from the date of incarceration, not the date the petition for termination is filed. It also provides explicit statutory provision for the court to consider the child's age and need for a permanent and stable home, something

---

be subsumed to the interests of the children. *See, e.g.*, *D.G. v. Dep't Children & Families*, 77 So. 3d 201, 210 (Fla. 4th DCA 2011); *see also In re M.A.L.*, 148 P.3d 606, 612 (Mont. 2006) (allowing retroactive application of TPR provision, noting that in a TPR proceeding "the best interests of the child are of paramount concern and take precedence over the rights of the parent"); *In re Marino S.*, 795 N.E.2d 21, 26-27 (N.Y. 2003) (provision that reasonable efforts to reunite family were not required for TPR, in cases of severe abuse, could be applied retroactively because it did not impair vested rights and was remedial).

expressed in *B.C.* in its admonition that termination should be based upon the actual effect of incarceration on the parent-child relationship.

Although we are unsure whether there is a difference between a "significant" period of time and a "substantial" period of time,[2] in this case B.K. will have been incarcerated for nearly fifty percent of S.C.'s minority when B.K. is released from prison. Further, at the time of trial the child was nearly six years old. She had been in foster care for the first year and a half of her life, then with her mother for about two years. When the Department removed her again, she was with one foster family for three months, and then placed with her siblings with her current foster family for the ten months preceding the final hearing. The length of S.C.'s current placement, her young age, and the fact that B.K. could not take custody of S.C. for several years at a minimum, would weigh in favor of termination given "the actual effect of incarceration on the parent-child relationship." *B.C.*, 887 So. 2d at 1054. Thus, there is competent, substantial evidence to support the trial court's finding that B.K. will be incarcerated for a significant portion of S.C.'s minority.

### *Whether termination is in the manifest best interest of the child*

Next, the trial court must find that termination is in the manifest best interests of the child. In making this determination, section 39.810, Florida Statutes, sets forth a list of non-exclusive relevant factors, which the trial court took into account:

> (1) Any suitable permanent custody arrangement with a relative of the child. . . .

> (2) The ability and disposition of the parent or parents to provide the child with food, clothing, medical care or other remedial care recognized and permitted under state law instead of medical care, and other material needs of the child.

> (3) The capacity of the parent or parents to care for the child to the extent that the child's safety, well-being, and physical, mental, and emotional health will not be endangered upon the child's return home.

---

[2] Dictionaries and thesauruses frequently use the words to define each other. *See, e.g., Roget's II: The New Thesaurus* 904, 975 (3d ed. 1995).

(4) The present mental and physical health needs of the child and such future needs of the child to the extent that such future needs can be ascertained based on the present condition of the child.

(5) The love, affection, and other emotional ties existing between the child and the child's parent or parents, siblings, and other relatives, and the degree of harm to the child that would arise from the termination of parental rights and duties.

(6) The likelihood of an older child remaining in long-term foster care upon termination of parental rights, due to emotional or behavioral problems or any special needs of the child.

(7) The child's ability to form a significant relationship with a parental substitute and the likelihood that the child will enter into a more stable and permanent family relationship as a result of permanent termination of parental rights and duties.

(8) The length of time that the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

(9) The depth of the relationship existing between the child and the present custodian.

(10) The reasonable preferences and wishes of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

(11) The recommendations for the child provided by the child's guardian ad litem or legal representative.

As noted previously, the trial court found that no suitable relative placements existed. B.K.'s incarceration prevented him from taking care of the child and providing for her needs. She had no bond with B.K., since he had been incarcerated just five months after her birth. While S.C. enjoyed receiving cards and letters from B.K., she did not know who he was. S.C. was doing very well in her present placement, which included her siblings, and it was desirable to maintain that stability and connection with her brothers. She had bonded with her foster parents, who wished to adopt all three children, and she was not age appropriate to continue in long-term foster care. Although the trial court based its finding in part on

the fact that B.K. did not have the capacity to care for S.C. on the uncompleted case plans from the dependency,[3] the main basis for this finding was his continued incarceration until 2017.

B.K.'s argument that it is not in S.C.'s best interest to terminate his rights is largely based upon his attempts to maintain contact with his daughter. As admirable as they are, they do not trump the need to establish permanency and stability in S.C.'s life. S.C. is in a stable home with her brothers with a family wanting to adopt all three children. B.K. agrees that she should not be removed from this relationship. If B.K.'s rights are not terminated, however, S.C. would remain in long-term foster care, and there is no guarantee that the present caregivers would continue in that role. B.K. earnestly wants to be a part of his child's life when he is released from prison, but even he admits that he would not be able, nor would it be desirable, to reunite with his daughter immediately. Therefore, she would continue in foster care. The trial court found that it was in S.C.'s manifest best interest to continue with a family that had bonded with her and where she is happy and secure. We conclude that the trial court's ruling was supported by competent substantial evidence.

### *Whether termination is the least restrictive means of protecting the child from serious harm*

Finally, the Department must show by clear and convincing evidence that termination is the least restrictive means to prevent serious harm to the child. *See Padgett,* 577 So. 2d at 571. "The least restrictive means test in the context of the termination of a parent's parental rights is not intended to preserve the parental bond at the cost of the child's future. . . . Rather, it simply requires that those measures short of termination should be utilized if such measures will permit the safe reestablishment of the parent-child bond." *L.B. v. Dep't of Children & Families*, 835 So. 2d 1189, 1195-96 (Fla. 1st DCA 2002).

In *B.C.,* the supreme court noted: "Termination of the parental rights of a parent who has played a supportive and beneficial role in the child's life despite the disabilities of incarceration probably would not meet" the requirements that termination is the least restrictive means of protecting the child and is in the child's manifest best interest. 887 So. 2d at 1053.

---

[3] The trial court did err in excluding B.K.'s testimony about his attempts in prison to complete case plan tasks, but we do not deem that to be reversible in this case, as the reason for termination was his continued incarceration.

The *B.C.* court cited to *In Interest of B.W.*, 498 So. 2d 946 (Fla. 1986), where the supreme court noted:

> [S]ince, as a practical matter, an incarcerated parent is unable to assume all parental duties, his failure to 'evince a settled purpose' to assume *all* duties cannot support a finding of abandonment. . . . [H]is efforts, or lack thereof, to assume his parental duties through communicating with and supporting his children must be measured against his limited opportunity to assume those duties while imprisoned.

*B.W.*, 498 So. 2d at 948. In a concurring opinion in *B.C.*, Justice Pariente noted "the public policy favoring a continuing relationship between imprisoned parents and their children," in part "as a tool to combat recidivism." 887 So. 2d at 1056. She opined that termination of parental rights should "occur only when continuing the parent-child relationship would pose a substantial risk of significant harm to the child and when absolutely necessary for the manifest best interests of the child." *Id.* at 1057.

In the present case, the trial court found termination of parental rights was the least restrictive means of protecting S.C. from harm because "[s]he has not seen her father since she was months old and she does not know who he is." In other words, there was no parental/child bond to re-establish. Although the father tried to the best of his ability to communicate with his child, he was incarcerated and has not been able to see her for six years. He has spoken to her only once. If termination were denied, then the child would be faced with continued foster care.

As noted in *In re K.W.*, 891 So. 2d 1068 (Fla. 2d DCA 2004), even where there might be long-term relative care available (which in this case there is not):

> While the court is required to consider the least restrictive means, the least restrictive means test is not intended 'to preserve a parental bond at the cost of a child's future.' *Dep't of Children & Families v. B.B.*, 824 So. 2d 1000, 1009 (Fla. 5th DCA 2002). Since there is little or no bond to protect and there was never a parent-child relationship to reestablish, long-term relative placement was not in the best interest of the child and was not required by the "least restrictive means" test.

*Id.* at 1070. Similarly, in *J.C. v. K.K.*, 64 So. 3d 157 (Fla. 4th DCA 2011), we noted, "The child's interests are paramount over the father's desire to now parent his child, where the child would have to remain in foster care for a substantial period of time to effectuate a reunion without harming the child further." *Id.* at 164.

In both of the foregoing cases, the fathers were given case plans which they failed to complete, and that was the ground for termination. In this case, B.K. was prevented from completing a case plan or from participating more in his child's life due to his incarceration. Nevertheless, if the focus is on the child, and not the parent, where the child has bonded with her caregivers, termination of parental rights is the least restrictive means of protecting the child from the harm of continued instability in her life.[4]

We do not think our holding is inconsistent with the statements in *B.C.* that termination of parental rights generally will not meet the least restrictive means test where the incarcerated parent has "played a supportive and beneficial role" in the child's life. If the mere sending of cards and letters to a child constitutes the performance of such a role, then it would be difficult indeed to terminate the rights of any parent incarcerated for a lengthy period of time, regardless of the child's lack of a real relationship with her parent. This could leave the child without any permanency at all, which would not be in her best interest.

It is difficult to read the testimony of this father who wants to be a parent to his child, or at least be involved in her life, and not to allow him to have that opportunity. The statutory framework for termination gives few options. *See* § 39.811, Fla. Stat. (2013). Pursuant to section 39.811(7)(b), Florida Statutes (2013), the court has the authority to make orders allowing continued contact with the parents if it is in the child's best interest. Here, the child does know she has a father who loves her and corresponds with her. While we affirm the termination of parental rights, we remand for the trial court to consider whether such an order may be appropriate in this case.

Based upon the highly deferential standard of review applied to these cases, we affirm the final judgment.

CIKLIN and GERBER, JJ., concur.

---

[4] No party asked the court to consider a permanent guardianship, nor was there any proof that the present foster parents would consider one instead of adoption. *See, e.g., State v. T.S.*, 155 So. 3d 476 (Fla. 1st DCA 2015).

\*          \*          \*