# Third District Court of Appeal

## State of Florida

Opinion filed August 8, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D18-46
Lower Tribunal No. 15-15090
_____

**C.R., the Mother,**
Appellant,

vs.

**Department of Children and Families and Guardian ad Litem Program,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Maria Sampedro-Iglesia, Judge.

Steven Grossbard, for appellant.

Karla Perkins, for appellee Department of Children & Families; Thomasina Moore (Tallahassee), Statewide Director of Appeals, for appellee Guardian ad Litem Program; Vincent F. Vaccarella, P.A., and Craig Robert Lewis (Fort Lauderdale), Pro Bono, Guardian ad Litem Program Defending Best Interest Project, for appellee Guardian ad Litem Program.

Before ROTHENBERG, C.J., and SALTER and FERNANDEZ, JJ.

ROTHENBERG, C.J.

C.R. ("the Mother") appeals from an order terminating her parental rights as to her minor child, D.R.A. ("the Child"). Because the Department of Children and Families ("the Department") failed to establish either of the statutory grounds alleged in its petition, we reverse.

## FACTS AND PROCEDURAL HISTORY

### A. Removal of the Children and Adjudication of Dependency

In late January 2015, the Mother and her teenage daughter, B.D., engaged in a physical altercation, which resulted in B.D. being arrested and "Baker Acted."[1] Thereafter, the Department took the Mother's three children into protective custody—A.D. (born early 1998), who also had a history of physical altercations with the Mother; B.D. (born late 1999); and the Child (born early 2008). The following day, the Department filed a dependency shelter petition alleging that the Mother's three children had been abused, abandoned, or neglected, or were in imminent danger of illness or injury as a result of the abuse, abandonment, or neglect. Following a shelter review hearing, the trial court entered an order on January 27, 2015, placing the three children in shelter care.[2]

On February 10, 2015, the Department filed a verified dependency petition,

---

[1] See § 394.451, Fla. Stat. (2015).

[2] The Child was initially placed with a non-relative, the Mother's friend. However, on June 4, 2015, the Child was removed from the non-relative and placed into foster care.

alleging that the Mother had abused, abandoned, neglected and/or placed the three minor children at imminent risk of harm based on the Mother engaging in domestic violence with her two teenage daughters, A.D. and B.D. The Mother consented to the dependency petition and, on July 24, 2015, the Mother's three children were adjudicated dependent. The order adjudicating the children dependent states that the Mother has mental health issues that, **if left untreated**, will interfere with her ability to safely parent her children; the Mother tested positive for illegal drugs on January 27, 2015; the Mother and B.D. engaged in domestic violence on January 21, 2015, while B.D. was allegedly intoxicated and out of control; and the Child had excessive absences from school since August 2015.

## B. The Case Plans Filed Prior to the Petition to Terminate the Mother's Parental Rights

To address the circumstances stated in the dependency order, the Department issued five case plans between August 18, 2015, and March 14, 2017, with each stating that the primary permanency goal was reunification.[3] Specifically, the case plans required the Mother to complete and/or participate in the following tasks and/or services: (1) complete a Level of Care Assessment; (2) submit to a psychological evaluation and receive medication management; (3)

---

[3] The case plans were issued on August 18, 2015, November 5, 2015, April 4, 2016, September 28, 2016, and March 14, 2017. The last three case plans did not include A.D. because she had reached the age of majority. Other case plans were filed after the Department filed its petition to terminate the Mother's parental rights on May 2, 2017, which stated that the primary permanency goal was now adoption.

3

attend parenting skills classes once a week for fourteen weeks to address the domestic violence between the Mother and her two teenage daughters, A.D. and B.D.; (4) attend family therapy; (5) attend individual psychotherapy due to the Mother being diagnosed with a mental health disorder, during which therapy, the Mother shall increase coping skills and gain insight; (6) participate in a substance abuse program and submit to random urinalyses for the duration of the case plan; and (7) show responsibility for the children's welfare.

## C. The Trial Court's Orders on Judicial Review/Permanency Review

The trial court addressed the Mother's compliance with the case plans and her progress in four separate Orders on Judicial Review/Permanency Review ("Orders on Judicial Review") filed on November 4, 2015, April 4, 2016, September 28, 2016, and March 20, 2017. The first order issued on November 4, 2015, showed little progress by the Mother except for her submitting to the psychological evaluation.

However, in the trial court's second Order on Judicial Review filed on April 4, 2016, the trial court noted that the Mother had completed the parenting class, the substance abuse evaluation, and the psychological evaluation. The Mother was also participating in an outpatient substance abuse program and individual counseling. Although the case plan in effect at that time stated that the Mother was to attend family counseling, the trial court's order made no finding as to family

4

counseling.[4]  The trial court concluded that the Mother had not "reached substantial compliance & is in partial compliance due to ongoing services," but noted that the Mother was in compliance with the court-ordered visitation.

The trial Court's third Order on Judicial Review dated September 28, 2016, found that the Mother was continuing to make progress.  The Mother had completed the parenting classes, the substance abuse evaluation, and the psychological evaluation. She was participating in an outpatient substance abuse program and individual counseling, she was maintaining adequate housing, and she had been complying with the court-ordered visitation.  Once again, the trial court concluded that the Mother was in partial compliance but that she had not reached substantial compliance with the case plan and made no reference to family counseling.  Importantly, however, the order states:  "**Mother is fully compliant & the Child [D.R.A.] is transitioning to [the Mother's care].**" (emphasis added). The case plan goal continued to be reunification, and the trial court entered an order changing the Mother's visitation with the Child from supervised visitations to unsupervised visitations with a minimum of twice a week and for a maximum of six hours per visit.

On March 20, 2017, the trial court entered its fourth and final Order on

---

[4] It appears that there was a substantial delay in referring the Mother to family counseling that was not attributable to the Mother.  The Mother and the Child did not commence family therapy until March 3, 2017.

Judicial Review. This order provided that the Mother had completed the parenting classes, the substance abuse evaluation, and the psychological evaluation; the Mother was currently participating in outpatient substance abuse program and individual counseling[5]; and the Mother was maintaining adequate housing. The trial court, however, again determined that the Mother had not reached substantial compliance and was "in partial compliance **due to services ongoing.**" (emphasis added). Notably, the trial court once again made no finding as to family counseling, although family counseling had commenced approximately two weeks earlier. The order continued to state that the primary goal was reunification.

## D. The Petition for Termination of Parental Rights

On May 2, 2017, approximately two months after the fifth case plan was issued, the Department filed a petition to terminate the Mother's parental rights based on two statutory grounds,[6] sections 39.806(1)(e)1., and 3., Florida Statutes (2017), which provide as follows:

---

[5] As will be discussed later in this opinion, the evidence presented at trial actually indicates that the Mother completed the outpatient substance abuse program and individual counseling in September 2016. However, in May 2017, the Mother voluntarily agreed to be re-referred to additional individual therapy to address her past trauma.

[6] As B.D. was reunified with the Mother on the same day the Department filed its petition for termination of parental rights, the petition pertained only to the Child, D.R.A. Further, the petition for termination of parental rights was filed as to both the Mother and the Child's legal father. The Mother informed the Department that the Child's legal father had been deported to Guatemala and that his whereabouts are unknown. The Child's legal father's parental rights were terminated via publication, and the termination of his parental rights are not at issue in this appeal.

6

(1) Grounds for the termination of parental rights may be established under any of the following circumstances:

. . . .

(e) When a child has been adjudicated dependent, a case plan has been filed with the court, and:

1. The child continues to be abused, neglected, or abandoned by the parent or parents. The failure of the parent or parents to substantially comply with the case plan for a period of 12 months after an adjudication of the child as a dependent child or the child's placement into shelter care, whichever occurs first, constitutes evidence of continuing abuse, neglect, or abandonment unless the failure to substantially comply with the case plan was due to the parent's lack of financial resources or to the failure of the department to make reasonable efforts to reunify the parent and child. The 12-month period begins to run only after the child's placement into shelter care or the entry of a disposition order placing the custody of the child with the department or a person other than the parent and the court's approval of a case plan having the goal of reunification with the parent, whichever occurs first; or

. . . .

3. The child has been in care for any 12 of the last 22 months and the parents have not substantially complied with the case plan so as to permit reunification under s. 39.522(2) unless the failure to substantially comply with the case plan was due to the parent's lack of financial resources or to the failure of the department to make reasonable efforts to reunify the parent and child.

## E. The Termination of Parental Rights Hearing and the Final Judgment Terminating the Mother's Parental Rights as to the Child

The termination of parental rights ("TPR") hearing was held over a three-day period commencing in early September 2017, and concluding in late October 2017. In December 2017, the trial court entered its final judgment terminating the Mother's parental rights as to the Child, finding that the Department had established by clear and convincing evidence both statutory grounds.[7] The

Mother's appeal followed.

## ANALYSIS

The Mother contends that the trial court erred by terminating her parental rights as to the Child. Because there was no competent, substantial evidence to support the trial court's determination that the Department established either of the two statutory grounds alleged in its petition, we agree.

To terminate parental rights, the Department is required to establish by clear and convincing evidence the existence of at least one statutory ground for termination, see § 39.806, Fla. Stat. (2017), and that termination is in the manifest best interest of the child and is the least restrictive means to protect the child from serious harm. See B.K. v. Dep't of Children & Families, 166 So. 3d 866, 873 (Fla. 4th DCA 2015). An appellate court's review of the final judgment terminating parental rights "is limited to whether competent, substantial evidence supports the trial court's final judgment, and whether the appellate court cannot say that no one could reasonably find such evidence to be clear and convincing." J.P. v. Fla. Dep't of Children & Families, 183 So. 3d 1198, 1203 (Fla. 1st DCA 2016) (quoting N.L. v. Dep't of Children & Family Servs., 843 So. 2d 996 (Fla. 1st DCA 2003)) (internal quotation marks omitted); see also T.P. v. Dep't of Children & Families,

---

[7] The trial court also found that that termination was in the manifest best interest of the Child and that termination is the least restrictive means to protect the Child from serious harm.

8

935 So. 2d 621, 624 (Fla. 3d DCA 2006) ("The standard of review for challenges to the sufficiency of the evidence supporting a termination of parental rights is whether the trial court's order is supported by substantial competent evidence.").

## A. The Statutory Grounds

### 1. Section 39.806(1)(e)1.

Section 39.806(1)(e)1. permits the termination of parental rights when a child is adjudicated dependent, a case plan has been filed with the trial court, **and** the parent fails "**to substantially comply with the case plan** for a period of 12 months after an adjudication of the child as a dependent child or the child's placement into shelter care, whichever occurs first. . . ." § 39.806(1)(e)1. (emphasis added). This statutory provision further states that a parent's failure to substantially comply "constitutes evidence of continuing abuse, neglect, or abandonment unless the failure to substantially comply with the case plan was due to the parent's lack of financial resources or to the failure of the [D]epartment to make reasonable efforts to reunify the parent and child." § 39.806(1)(e)1. Section 39.01(78), Florida Statutes (2017)[8], provides that "'substantial compliance' means that the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well-being and safety of the child will not be endangered upon the child's remaining with or being returned to the child's

_____

[8] Effective July 1, 2018, the definition of "substantial compliance" appears in section 39.01(84), Fla. Stat. (2018).

parent."

In the instant case, the Child was adjudicated dependent and case plans were filed with the trial court. However, as will be addressed below, there was no competent, substantial evidence to support the trial court's determination that the Department established by clear and convincing evidence that the Mother failed to "substantially comply" with the case plan.

**(a) The Case Plan Tasks**

The case plan required the Mother to complete several tasks to address and remedy the "circumstances which caused the creation of the case plan." The record before this Court, including the testimony at the TPR hearing and the exhibits introduced at the TPR hearing, reflects that the Mother completed the following assigned tasks:

*1) Complete a Level of Care Assessment*

The Mother completed the Level of Care Assessment on March 15, 2015, which was prior to the issuance of the initial case plan in August 2015.

*2) Submit to a Psychological Evaluation and Receive Medication Management*

The Mother submitted to a psychological evaluation on February 3, 2015, conducted by Dr. Rebecca Harvey, a clinical psychologist. Dr. Harvey's testimony at the TPR hearing and her report, which was introduced into evidence, reflect that the Mother has a history of volatile relationships, mood issues, and mood

management issues, which would be consistent with a bipolar anxiety issue. As to the Mother's parenting skills, Dr. Harvey concluded that the Mother was overwhelmed and "bewildered" as to how to manage her daughters' aggressive behaviors. During the evaluation, the Mother acknowledged that many of her childhood experiences, including physical and mental abuse by her father, have impacted her parenting abilities.

Based on the evaluation, Dr. Harvey opined that the Mother suffers from a bipolar disorder, a generalized anxiety disorder, a post-traumatic stress disorder, and a substance abuse disorder. Dr. Harvey concluded that the Mother was in need of various services to enable her to provide a safe and healthy environment for her children. Dr. Harvey recommended that the Mother participate in individual therapy to: (1) address her mood issues; (2) address her childhood experiences and to examine how her childhood impacts her parenting; (3) work on developing positive coping skills; and (4) address her tendency to relate to her children as peers. In addition, Dr. Harvey recommended that the Mother continue to regularly see a psychiatrist and to receive medication management; attend a substance abuse treatment program; attend parenting classes to learn how to communicate with her children and cope with her children's defiant behavior; and participate in family therapy with her children to learn how to solve problems, de-escalate arguments, and express thoughts and feelings appropriately. These recommendations were the

foundation for the tasks assigned to the Mother in the case plans.[9]

The record reflects that the Mother began seeing a psychiatrist, Dr. Priscilla Borrego, in November 2015. Dr. Borrego diagnosed the Mother as being bipolar and prescribed several medications. At the TPR hearing, Dr. Borrego testified that the Mother has been compliant with taking her medications and attending her appointments. Dr. Borrego also testified that she has seen improvements in the Mother—the Mother is calmer, has fewer mood swings, speaks less rapidly, is sleeping better, has a better appetite, and attends her sessions in better spirits.

### 3) *Attend Parenting Skills Classes*

The Mother commenced parenting classes on August 31, 2015, and successfully completed the classes on December 21, 2015. Janet Martinez, the Parenting Facilitator at the Family Resource Center, testified that the Mother submitted to the Adult-Adolescent Parenting Inventory Assessment ("AAPI-2") both pre-services and post-services, and the results of these assessments were outlined in Ms. Martinez's final report that was introduced into evidence at the TPR hearing. Ms. Martinez's final report states:

> The [AAPI-2] is designed to assess the parenting and child rearing attitudes of adults and adolescent parents and pre parent populations. Based on the known parenting and child rearing behaviors of abusive parents, responses to the inventory provide an index for practicing

---

[9] Dr. Harvey testified that following her assessment of the Mother, she believed that the Mother's individual therapy should also include "trauma" therapy, but that "[l]ooking back on [her] report [she] didn't exactly use those words."

behaviors know to be attributable to child abuse and neglect. Responses to the AAPI-2 provide an index of risk in five specific parenting and child rearing behaviors:

Construct A- Inappropriate Expectations of Children
Construct B- Parental Lack of Empathy towards Children's Needs
Construct C- Strong Parental Belief in the Use of Corporal Punishment
Construct D- Reversing Parent-Child Family Roles
Construct E- Oppressing Children's Power and Independence

For each parenting construct, the score can range from one to ten, with a score of one to three indicating high risk, four to seven indicating medium risk, and eight to ten indicating low risk. Ms. Martinez's report sets forth the following pre-classes and post-classes scores for each parenting "construct": (A) inappropriate expectations of children: pre-parenting classes—3 (high risk); post-parenting classes—9 (low risk); (B) parental lack of empathy towards children's needs: pre-parenting classes—2 (high risk); post-parenting classes—8 (low risk); (C) strong parental belief in use of corporal punishment: pre-parenting classes—5 (medium risk); post-parenting classes—9 (low risk); (D) reversing parent-child family roles: pre-parenting classes—3 (high risk); post-parenting classes—5 (medium risk); and (E) oppressing children's power and independence: pre-parenting classes—5 (medium risk); post-parenting classes—9 (low risk). Thus, Ms. Martinez's report reflects that the Mother not only completed the parenting classes, but she showed significant improvement as to each parenting "construct" following the parenting classes, with four of the five constructs now being in the "low risk" category and

one construct being in the "medium risk" category.

*4)  Attend Family Therapy*

Although family therapy was a task included in the initial case plan issued in August 2015, the Mother did not commence family therapy with the Child until March 3, 2017, only six months before the TPR hearing commenced, and the family therapy was ongoing at the time of the hearing.  It does not appear that the delay in commencing family therapy was attributable to the Mother.

Mr. Jeremiah Model, a registered mental health intern at Advance Health Community Services, described a positive relationship between the Mother and the Child:

> [The Child] has a lot of affection towards the mom.  There is a lot of appropriate touch.  [What] I mean by appropriate touch, there is hugging.  There [are] kisses, and she seems pretty happy in my opinion. . . .  From observations[, the Child] seems to be very elated. . . .  Like I would ask her questions about the weekend and how it went with mom, and she seems pretty happy.  And she seems very happy when she is leaving with mom after the sessions because they will usually have events planned like going out to restaurants and spending quality time with each other or going to the pool or going to the beach or some sort.

Mr. Model also testified that although the Child is guarded during therapy, the Mother and the Child have progressed, but are still in need of family therapy.  Mr. Model could not, at that point, recommend reunification because "**six months is not enough for me to gain all the information**."  Thus, Mr. Model's testimony reflects that the mother had made progress during family therapy, but that family

14

therapy had not been completed, and six months of therapy was not enough for him to gain the necessary information to make a recommendation. However, based on the delayed referral to family therapy, the failure of the Mother to complete family therapy at the time of the hearing was not attributable to her.

5) *Attend Individual Therapy*

The Mother was referred to a combined substance abuse therapy and individual therapy at Banyan Health Systems. The therapies commenced in December 2015, and were completed in September 2016, approximately a year before the commencement of the TPR hearing.

Thereafter, in May 2017, the Mother **voluntarily** agreed to additional individual therapy at Jessie Trice Community Health Center and began therapy with Gladys Amador, a mental health counselor. Ms. Amador conducted the initial screening and assessment of the Mother on June 12, 2017, and the final session was on August 3, 2017, approximately a month before the TPR hearing commenced. Ms. Amador testified that she generally conducts twelve sessions of therapy, but she only had five sessions with the Mother due, in part, to conflicts in Ms. Amador's schedule and the Mother's hospitalization in the month of August. The focus of the twelve-week therapy period was to address the **Mother's history of trauma**.[10] Ms. Amador testified that five sessions is not enough to make

---

[10] As stated earlier, Dr. Harvey testified that her report should have provided that the Mother's individual therapy should also include "trauma" therapy. Further,

significant progress because the five sessions were "**really rapport building**." (emphasis added). However, Ms. Amador noted that during her five sessions with the Mother, the Mother was very engaged and open to suggestions.

*6) Participate in a Substance Abuse Program and Remain Drug Free*

The Mother participated in an outpatient substance abuse program at Banyan Health Systems with Lorena Paar, an outpatient substance abuse therapist. Ms. Paar's reports, which were introduced into evidence, and her testimony at the TPR hearing reflect that the Mother commenced the outpatient substance abuse program in December 2015 and successfully completed the program in September 2016. While attending the program, the Mother was subject to random drug testing, and on November 4, 2015, the trial court ordered the Mother to submit to urinalyses three times per week. The testimony at the TPR hearing reflects that **the Mother had been drug free for nearly two years**.

*7) Show Responsibility for the Children's Welfare*

As to this final task, the case plan indicated that this task would be deemed completed upon achieving all goals of the case plan.

**b) Substantial Compliance with the Case Plan**

We acknowledge that completion of the tasks in a case plan does not

_____

unlike the past case plans, the September 28, 2016 case plan provided for the first time that the Mother "should engage in evidence based **trauma counseling** in order to **deal with past trauma**." (emphasis added).

necessarily equate to "substantial compliance" with a case plan. As previously stated, "substantial compliance" with a case plan "means that the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well-being and safety of the child will not be endangered upon the child's remaining with or being returned to the child's parent." § 39.01(78). In the instant case, the order adjudicating the Child and her siblings, A.D. and B.D., dependent reflects that the following "circumstances" caused the creation of the case plans: (a) the Mother's mental health issues, which if left untreated, will interfere with her ability to safely parent her children; (b) the Mother tested positive for drugs; (c) the Mother engaged in domestic violence with B.D.; and (d) the Child had excessive absences from school.

The record before this Court indicates that these "circumstances" have been "significantly remedied." First, the Mother's mental health issues have been addressed. She is currently under the care of psychiatrist, and the Mother is attending her appointments and taking her prescribed medications. Moreover, the psychiatrist testified that she has seen improvements in the Mother. Second, the Mother is not taking or using drugs. She successfully completed the outpatient substance abuse program and has tested negative for drugs for almost two years. Third, as to the Mother engaging in domestic violence with B.D., the record indicates that this "circumstance" has been "significantly remedied." B.D. is

17

currently living with the Mother; B.D. received "wrap around" services, including therapy; and there have been no physical altercations between the Mother and B.D. since the Department permitted B.D. to move back into the Mother's home in May 2017. The record further reflects that A.D. and A.D.'s child are no longer living with the Mother, and there have been no further incidents of domestic violence between A.D. and the Mother. In addition, the Mother successfully completed parenting classes, and her post-classes scores on the AAPI-2 show that the Mother has significantly improved, with four of the five parenting constructs being at "low risk" and one being at "medium risk." Finally, there is no indication in the record that the Mother would continue to allow the Child to miss so many days of school. Thus, the record does not contain competent substantial evidence that the Mother failed to substantially comply with her case plan.

This Court's decision in C.G. v. Department of Children & Families, 67 So. 3d 1141, 1142 (Fla. 3d DCA 2011), is factually distinguishable from the facts in the instant case. In C.G., the minor child's mother failed to substantially comply with her case plan, and the trial court entered a final order terminating C.G.'s parental rights pursuant to section 39.806(1)(e)1. C.G. initially consented to her child being adjudicated dependent after the court determined that C.G. had mental health issues. Id. at 1142-43. The child was returned to C.G. for a brief period of time, but was returned to state custody after C.G. was convicted of prostitution. Id.

at 1143. C.G. was assigned five reunifications plans over a two-year period, with each plan requiring C.G. to maintain a job, secure safe and consistent housing, undergo mental health evaluations and medication management, attend substance abuse therapy, and attend parenting classes. Id. at 1144. The evidence presented at the TPR hearing reflected that C.G. failed to complete the psychotherapy sessions, the medication management program, and the substance abuse therapy, and that C.G. refused to follow a court order directing her to enter an inpatient substance abuse program. Id. Although C.G. completed the assigned parenting classes, her scores on the post-services test led the case manager to opine that reunification was not a safe option for the child. Id. On appeal, this Court affirmed the final order terminating C.G.'s parental rights, concluding as follows:

> [T]he trial court's finding that clear and convincing evidence supported the termination of parental rights was based, in part, on competent and substantial evidence contained in the underlying dependency records. The state additionally demonstrated, by clear and convincing testimonial evidence, that C.G. failed to substantially comply with the case plans and made little effort to remedy the harmful behavior and circumstances that initially brought her child into foster care. We thus agree with the trial court that termination of [C.G.'s] parental rights is the least restrictive means of protecting the ultimate welfare of the child.

Id. at 1144-45 (internal quotation marks and citation omitted).

The facts in C.G. could not be more factually disparate from the facts in the instant case. Unlike C.G., in the instant case, the Mother has completed all tasks and/or services assigned to her in her case plans. Further, unlike C.G., the Mother

19

in the instant case remedied the circumstances that initially brought her children into foster care. Basically, the Mother has done everything the Department has asked her to do—(1) she completed a Level of Care Assessment; (2) she submitted to a psychological evaluation, and she is compliant with her psychiatric appointments and taking the medications prescribed by her psychiatrist; (3) she attended parenting skills classes, and unlike C.G., the Mother's post-services scores increased dramatically; (4) she is attending family therapy; (5) she completed individual therapy, and the Mother voluntarily agreed to additionally therapy; and (6) she participated in a substance abuse program and has **remained drug-free for almost two years**. Additionally, the Mother is employed and is maintaining suitable housing.

### c) The Mother's Isolated Statement to the Child

Despite the Mother's significant efforts, completion of services, and tremendous progress, the Department argued and the trial court found that the Mother had not gained sufficient "insight." This determination was based primarily on a single incident that occurred a couple of days prior to the commencement of the TPR hearing. During one of the Mother's unsupervised visitations, the Mother told the Child that if the trial court terminated her parental rights and the Child stays with the foster mother, the Mother will move back to New York, the Child will never see the Mother again, and the Mother will have

another girl. Following this statement, the Child became sad and reported this conversation to the foster mother. The Mother acknowledged during the TPR hearing that she was aware of the trial court's order prohibiting her and others from discussing the case unless the discussion took place in a therapeutic setting.

We agree with the trial court's determination that this conversation was inappropriate. However, this one isolated incident was insufficient to support the trial court's finding that the Mother failed to substantially comply with her case plan, warranting the termination of the Mother's parental rights. The Mother began unsupervised visitation with the Child on September 28, 2016, almost a year prior to the commencement of the TPR hearing. The Mother's inappropriate conversation with the Child was the only inappropriate conversation during the almost one-year period. Further, the evidence reflects that the Child is bonded to and loves her Mother. See L.A.G. v. Dep't of Children & Family Servs., 963 So. 2d 725, 727 (Fla. 3d DCA 2007) ("The only evidence that the mother deviated from the case plan were two occasions when she had contact with the father and paternal grandmother. These two incidents are insufficient to support a finding that the mother failed to substantially comply with her case plan and to terminate her parental rights.").

Accordingly, based on the above analysis, we conclude that there was a lack of competent, substantial evidence to support the trial court's finding that the

21

Department established by clear and convincing evidence the statutory ground set forth in section 39.806(1)(e)1.

## 2. *Section 39.806(1)(e)3.*

The Department also sought termination pursuant to section 39.806(1)(e)3., which permits the termination of parental rights when a child is adjudicated dependent, a case plan has been filed with the trial court, and

> [t]he child has been in care for any 12 of the last 22 months **and** the parents have not substantially complied with the case plan so as to permit reunification under s. 39.522(2) unless the failure to substantially comply with the case plan was due to the parent's lack of financial resources or to the failure of the [D]epartment to make reasonable efforts to reunify the parent and child.

(emphasis added).[11]

It is undisputed that the Child "has been in care for any 12 of the last 22 months." However, for the reasons previously stated, we conclude that there was a lack of competent, substantial evidence to support the trial court's finding that the Mother failed to substantially comply with her case plan and that the circumstances that caused the Child's out-of-home placement have not been "remedied to the

---

[11] Section 39.522(2), Florida Statutes (2017), provides as follows:
> In cases where the issue before the court is whether a child should be reunited with a parent, the court shall review the conditions for return and determine whether the circumstances that caused the out-of-home placement and issues subsequently identified have been remedied to the extent that the return of the child to the home with an in-home safety plan prepared or approved by the department will not be detrimental to the child's safety, well-being, and physical, mental, and emotional health.

extent that the return of the child to the home **with an in-home safety plan** prepared or approved by the department will not be detrimental to the child's safety, well-being, and physical, mental, and emotional health." § 39.522(2) (emphasis added). Accordingly, we conclude that the Department failed to establish by competent substantial evidence the statutory ground set forth in section 39.806(1)(e)3.

## B. *Manifest Best Interest of the Child and Least Restrictive Means*

The undisputed record evidence is that the Child remains bonded with the Mother, and several witnesses supported the reunification of the Mother and the Child. However, we do not need to address whether the trial court's findings that termination was in the manifest best interest of the Child and is the least restrictive means to protect the Child from serious harm are supported by clear and convincing evidence because we have concluded that the there was a lack of competent, substantial evidence to support the trial court's finding that the Department established by clear and convincing evidence the statutory grounds set forth in the petition to terminate the Mother's parental rights. See B.K. v. Dep't of Children & Families, 166 So. 3d 866, 873 (Fla. 4th DCA 2015).

We do note, however, that despite the Mother's significant progress, the child therapist found that Child has "shown little, measureable improvement" since therapy began, and the Child does not "open up" during therapy as to her

relationship with her Mother. Although the record is unclear as to why the Child does not "open up" during therapy, the record reflects that the Child has met with approximately five different therapists since being removed from the Mother's home and she did not receive therapy for at least three months.[12]

The constant change of therapists may have contributed to the Child not opening up during therapy. As one expert testified at the TPR hearing, it takes approximately five sessions for a therapist to build "rapport" with a patient. Thus, it is unclear whether the Child's failure to "open up" about her Mother is attributable to some sort of past trauma or to the Child not receiving therapy for at least three months or from the Child being subjected to so many different therapists since being removed from the Mother's home. At this point, the Department should attempt to slowly reunify the Mother and Child and to coordinate therapy for the Child with the same therapist, if possible.

Accordingly, we reverse the order terminating the Mother's parental rights as to the Child, D.R.A., and remand for further proceedings consistent with this

_____

[12] On October 5, 2016, the trial court issued a rule to show cause ordering Family Resource Center to appear before the trial court to show cause why it should not be held in indirect civil contempt for failing to comply with the trial court's order pertaining to individual therapy for the Child. The rule to show cause reflects that the trial court ordered therapy for the Child, and although therapy was commenced, it had ceased, and the Child had not received any therapy for three months, without any explanation. Following the show cause hearing, the trial court did not hold Family Resource Center in indirect civil contempt, finding that the Child was now receiving therapy.

opinion.

Reversed and remanded.